*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0380p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
>    *Plaintiff-Appellee/Cross-Appellant,*

> *v.*

Nos. 05-2084/2282

RODERICK HENRY,
>    *Defendant-Appellant/Cross-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-80128—Denise Page Hood, District Judge.

Argued: September 17, 2008

Decided and Filed: October 17, 2008

Before: DAUGHTREY and GILMAN, Circuit Judges; MILLS, District Judge.[*]

---

## COUNSEL

**ARGUED:** James C. Thomas, PLUNKETT & COONEY, Detroit, Michigan, for Appellant. Jennifer J. Sinclair, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** James C. Thomas, PLUNKETT & COONEY, Detroit, Michigan, for Appellant. Jennifer J. Sinclair, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge. This case arises from a large-scale drug-trafficking operation that transported cocaine on musical-band tour buses from Los Angeles to Detroit and other cities. The drugs were stored inside large concert speakers in amounts of up to 150 kilograms per trip. Cocaine and several million dollars in cash proceeds were seized by the police when they finally stopped the operation in February 2000.

After hearing extensive incriminating evidence, including the testimony of six coconspirators in the drug-trafficking operation, a jury convicted Roderick Henry of conspiracy to possess five kilograms or more of cocaine with the intent to distribute the drug. Following the jury verdict, the district court calculated the applicable U.S. Sentencing Guidelines range at 324 to 405 months of

---

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

imprisonment, but sentenced Henry to the considerably shorter term of 180 months. Henry now appeals his conviction, asserting that he was denied a fair trial because of prosecutorial misconduct during closing argument. The government cross-appeals Henry's sentence, which it considers too lenient. For the reasons set forth below, we **AFFIRM** Henry's conviction, but **VACATE** his sentence and **REMAND** the case to the district court for resentencing consistent with this opinion.

## I. BACKGROUND

The government alleged at trial that Henry was a partner in a major drug conspiracy that obtained cocaine from Mexican drug suppliers in Los Angeles and transported the drugs to Detroit and other cities in the United States. Although Henry occasionally caused cocaine to be transported by other means, the government asserted that he devised a plan to transport large amounts of cocaine in tour buses that normally traveled with musical bands. The operation's *modus operandi* was to pack 50 kilograms of cocaine into a large concert speaker and to then place several such speakers in the cargo bay of the bus. Upon arrival at the destination, the drugs would be unloaded and sold. The cash proceeds would then be packed into the speakers and the speakers loaded back on the bus for the return trip to Los Angeles.

On February 15, 2000, the Detroit police acted on tips from informants and seized powder cocaine, crack cocaine, and money from two residences in the city. The money was bundled and hidden in large concert speakers stored in one of the homes. On the same day, the police arrested Gregory Jackson, one of the coconspirators. Jackson was driving a truck that contained another speaker that held more than $1 million in bundled cash. A search of Jackson's person revealed that he had an additional $79,000 in cash inside his jacket. Federal agents ultimately seized more than $3.2 million in drug proceeds from the Detroit searches. Almost 3 kilograms of cocaine and 244 grams of heroin were also seized from one of the Detroit residences in question.

Alerted by authorities to look for a specific tour bus, the police in Taylor, Michigan pulled over a bus on the same day as the Detroit seizures. On board the bus were Donald Gatlin and Kevin Minniefield, the latter being the drug operation's principal driver. The bus was on its way back to California. A search revealed one concert speaker with approximately $1.2 million in cash hidden inside, allegedly the proceeds from drugs that had been sold in Baltimore, Maryland. Police also seized three handguns, several cell phones, and various documents from the bus.

Gatlin was arrested during the seizure of the bus and was eventually prosecuted in California on an unrelated drug charge involving Mark Yoakum, Henry's alleged partner in the operation. Minniefield was also arrested, released, and then rearrested in 2003. He eventually pled guilty to being a felon in possession of a firearm. Both Gatlin and Minniefield testified at Henry's trial.

Although Henry was in Los Angeles at the time the bus was seized, the government asserted that he had organized the bus trip to Detroit and Baltimore that resulted in the February 15, 2000 searches and seizures. Specifically, the government alleged that Henry was responsible for putting three speakers on the bus in Los Angeles, that two of the speakers were delivered in Detroit and one went to Baltimore, and that each of the three speakers originally contained 50 kilograms of cocaine. Jackson was allegedly responsible for the two speakers that were left in Detroit; Gatlin was allegedly responsible for the speaker that went on to Baltimore.

Jackson, who was released on bond after his arrest, agreed to cooperate with the police. He taped subsequent phone calls to Henry. During these conversations, the topics included whether Gatlin was cooperating with the police, the use of cell phones, and Jackson's request for a different attorney. Henry also told Jackson that he should put on his "gogo boots," which Jackson and the government interpreted as an instruction that Jackson should "jump bond" and disappear.

At Henry's trial, Jackson testified that Cesar Soto was Henry's supplier. Jackson admitted that he had helped Henry unload several hundred kilograms of cocaine delivered by Soto, and said that he had seen 200 to 250 kilograms of cocaine stored at Henry's home. He explained that he and Henry had originally transported cocaine to Detroit by airplane, but that Henry came up with the idea of using musical-band tour buses to transport the drugs. Jackson also described numerous bus trips that involved large amounts of cocaine, and claimed to have seen Henry and his wife counting drug money. Although Jackson faced a possible sentence of 20 years, his plea agreement included a motion for a reduction of his sentence to between 10 and 12 years of imprisonment.

Soto, Henry's alleged supplier, was arrested in April 2002. He pled guilty to a drug charge unrelated to Henry's case and was incarcerated at the time of Henry's trial. As part of Soto's plea agreement, the government decided not to prosecute him in connection with the seizures of drugs and money that led to Henry's conviction. Soto's plea agreement also stated that within one year of his original sentence, the government could file a motion under Rule 35 of the Federal Rules of Criminal Procedure to reduce that sentence. Soto testified that he understood that the reduction would be based on his cooperation in Henry's case. The Rule 35 motion was pending at the time Soto testified at Henry's trial.

At trial, Soto said that he supplied Henry with cocaine and that Henry and Yoakum were partners. Soto claimed that Henry and his wife counted money at their home using a money counter, and that Soto's workers provided Henry with 150 kilograms of cocaine in the year 2000. The government alleged that this cocaine was sent to Detroit and Baltimore, and that the concert speakers seized by the police in the various searches on February 15, 2000 contained the proceeds from the drug sales. Soto said that he and his workers delivered cocaine directly to Henry's house.

The principal bus driver, Minniefield, testified that he drove buses to Detroit at Jackson's request seven times. Minniefield also stated that, on one occasion when someone was trying to break into a car containing a speaker, he fired a gun at that person. He further alleged that he saw Henry in Detroit "just about every time" he went there, that Henry was in Los Angeles "just about each and every time" the speakers were unloaded, and that Henry rode with him on the bus from Detroit to California on one occasion.

Minniefield further testified that, after his first arrest, he saw Henry three times in California before Minniefield was arrested again. He said that Henry suggested on one occasion that Minniefield might not "remember" various facts due to the passage of time. Although Minniefield testified at Henry's trial that he had not made any agreement with the government for a sentence reduction, his plea agreement included a provision for a possible sentence reduction if he provided substantial assistance to the government.

Derrick Reynolds was another member of the alleged conspiracy. The record is unclear regarding Reynolds' exact role, but he appears to have been an associate of Henry's who received large amounts of the drugs transported on the tour buses. Reynolds pled guilty to a drug-trafficking charge in an unrelated case. At Henry's trial, Reynolds acknowledged that the government had filed a motion to reduce his sentence in that case pending his testimony in Henry's case.

Reynolds testified at Henry's trial that between 600 and 800 kilograms of cocaine came to him in Detroit on tour buses and by other means, and that he met with Henry and other members of the alleged conspiracy in Los Angeles in January 2000. After the bus was seized in Michigan on February 15, 2000, Reynolds contends that Henry asked him if he could send an attorney to talk to Jackson, who was then in jail. Reynolds sent an attorney to meet with Jackson, but Jackson refused to talk to him.

Another key witness at Henry's trial was Christine Kah, Yoakum's girlfriend. Kah worked at a Ramada Inn in Detroit, where Henry and Yoakum often stayed while they were in Michigan. She cooperated with federal agents and received government funds totaling $1,500 to relocate to Canada, where she is a citizen. Kah returned to the United States, however, to testify at Henry's trial. She said that Henry and Yoakum were business partners who she believed promoted music groups. She also stated that a large amount of cash was stored at Yoakum's apartment in Detroit, that she had seen concert speakers on a bus associated with Henry, and that once she was with Henry and Yoakum when they delivered two concert speakers to someone in Detroit named Big Al.

Carl McMullan, Henry's former brother-in-law, also testified at Henry's trial. McMullan was arrested in February 2001 and prosecuted in Michigan on a separate drug charge involving Soto, Henry's alleged cocaine supplier. The government requested that McMullan be sentenced at the low end of his applicable Guidelines range in exchange for his cooperation in Henry's case. McMullan was interviewed by the government about the case while he was in prison in July 2001.

At Henry's trial, McMullan testified that Henry had a steady supply of cocaine, had once shown him 100 kilograms of cocaine in a car, and had stated that he owed $180,000 to Soto. McMullan also said that he had helped to count money at Henry's residence on numerous occasions. After the bus and the proceeds from the cocaine were seized by police on February 15, 2000, Henry told McMullan about the bust. McMullan further testified that shortly after the bust, Soto tried to convince him to bring Soto to Henry's home to discuss the money that Henry owed Soto. He refused to do so because he believed that Soto might try to kill Henry. Finally, McMullan testified that, after his arrest, he had no contact with anyone involved in the drug conspiracy.

Henry was arrested at his home in October 2001. No money, drugs, or other paraphernalia were found inside, and a trained drug dog did not alert to the presence of any drugs. The police seized various documents, including receipts for landscaping and jewelry, notes about the present case, and an application for an apartment in the name of an alias used by Derrick Reynolds. These documents, along with phone records showing calls between Henry, Reynolds, Gatlin, and other individuals involved in the alleged drug conspiracy, as well as records from the Ramada Inn in Detroit showing that Henry, Kah, and Gatlin had stayed there, were presented at Henry's trial.

Henry testified in his own defense. He denied that he was involved in any drug conspiracy or that he had ever bought or sold cocaine. He also said that the money he had came from loans, the sale of a home and a car, and a settlement that he received from an injury suffered at work. Henry admitted that he knew Jackson, but asserted that he was responsible only for the promotion of musical bands and organizing tours.

A jury convicted Henry on one count of conspiracy to possess cocaine with the intent to distribute five kilograms or more of the drug, the crime being in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A)(ii), and 21 U.S.C. § 846. The jury determined by special verdict that the quantity of cocaine at issue in the case was 150 kilograms or more.

Henry's Presentence Report (PSR) set his advisory Sentencing Guidelines range at 235 to 293 months of imprisonment. The government filed objections to the PSR, and sought to enhance Henry's offense level for possession of a firearm, for obstructing and attempting to obstruct justice, and for his leadership role in the conspiracy. Henry, in contrast, argued that a reasonable sentence was the statutory minimum of 10 years. The district court rejected the majority of the government's suggested enhancements, but added three levels to Henry's final offense level for his leadership role in the conspiracy. Henry's final offense level was set at 41 and his Guidelines range was determined to be between 324 and 405 months of imprisonment. The court, however, ultimately sentenced Henry well below the Guidelines range to 180 months in custody and five years of supervised

release. Henry timely appealed his conviction, and the government filed a cross-appeal relating to his sentence.

## II. ANALYSIS

### A.　Prosecutorial-misconduct claims

Henry contends that he was denied his due process right to a fair trial as a result of prosecutorial misconduct. Specifically, he asserts that the prosecutor (1) misstated the evidence on multiple occasions during the closing argument, (2) improperly vouched for the credibility of government witnesses, (3) made arguments that improperly shifted and reduced the government's burden of proof, and (4) improperly defined the reasonable-doubt standard in emotional terms.

### 1.　*Standard of review*

Allegations of prosecutorial misconduct contain mixed questions of law and fact that we usually review de novo. *United States v. Green*, 305 F.3d 422, 429 (6th Cir. 2002). This court employs a two-step inquiry to determine whether prosecutorial misconduct has occurred. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). First, we determine whether a statement was improper. *Id.* If it was improper, we next examine whether the statement was so "flagrant" as to warrant reversal. *Id.* We consider four factors in determining whether a statement was flagrant: (1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused. *Id.* at 549-50.

Because Henry's counsel failed to object during the trial to either the prosecutor's remarks or to any evidence relied upon by the prosecutor, we review his prosecutorial-misconduct claims under the plain-error standard rather than de novo. *See United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001); Fed. R. Crim. P. 52(b). Plain-error review requires us to determine whether "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Emuegbunam*, 268 F.3d at 406. "Only in exceptional circumstances in which the error is so plain that the trial judge and prosecutor were derelict in countenancing it will this court reverse a conviction under the plain-error standard." *Id.*

We afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were "otherwise fair." *United States v. Young*, 470 U.S. 1, 11 (1985); *see also United States v. Hitow*, 889 F.2d 1573, 1579 (6th Cir. 1989) ("Even if certain comments are found to be inappropriate, they . . . must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error."(citation omitted)). This requires us to examine "defense counsel's conduct, as well as the nature of the prosecutor's response." *Young*, 470 U.S. at 12. Henry's conviction will not be set aside if "prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray." *See id.*

### 2.　*Allegations regarding misstatements of the evidence*

Henry's first contention is that his conviction should be set aside because the prosecutor misstated the evidence during closing and rebuttal arguments. Specifically, Henry alleges that the prosecutor misrepresented the testimony of government witnesses Kah, Jackson, and McMullan, as well as Henry's own testimony.

In his closing argument, the prosecutor said that Kah "told you about the apartment that was rented for counting money," and that Kah had testified that Henry "had decided to personally deliver that speaker to Big Al's house at three or four . . . in the morning." Henry asserts that Kah did not testify as to *why* the apartment was rented, and did not say that Henry alone decided to deliver two speakers to Big Al's house. Instead, Kah had said that Henry and Yoakum *jointly* agreed to deliver the speakers to the residence.

Kah did testify at trial that she often saw "thousands and thousands of dollars" at the apartment and that money was regularly counted there. The prosecutor's characterization that the apartment was rented for the purpose of counting money was therefore not totally devoid of factual support in the record. Furthermore, the fact that money was counted at the apartment was far more significant than whether the apartment was rented solely for that purpose.

Henry's argument about the delivery of the two speakers is likewise without merit. No relevant distinction can be drawn between Kah's statement that Henry and Yoakum together decided to deliver the speakers to Big Al and the prosecutor's statement implying that Henry alone decided to do so. Kah clearly testified that she heard Henry say that he needed to deliver two speakers to Big Al's house and that she witnessed the speakers being delivered there that night. The prosecutor's references to Kah's testimony were therefore not improper.

Henry next alleges that the prosecutor mischaracterized Jackson's testimony by stating that Henry had told Jackson that "he needed a gun for Red," one of the coconspirators, and by saying that Jackson had given Henry a "free phone." Specifically, Henry asserts that he asked Jackson only to loan a gun to Red, and that he had testified that he bought the phone and paid the monthly charges.

Jackson, however, testified at trial that Henry had asked him to provide a gun to the coconspirator in question. He also said that he told Henry that he would provide the "extra handgun" to the coconspirator in order to "secure the bus." And although Henry testified at one point during the trial that he paid for the phone that Jackson provided him, Henry had previously said that Jackson "gave" him a phone after he complained to Jackson about his expensive cell-phone bills. The prosecutor's statements relating to the gun and the phone were therefore supported by the evidence and provide no basis for the claim of prosecutorial misconduct.

Henry further asserts that the prosecutor's statement that McMullan did not know "whether or not Cesar Soto is cooperating, doesn't know whether Cesar Soto has been indicted, [and] doesn't have any idea what Cesar has said" was a mischaracterization of McMullan's testimony. McMullan testified, however, that from the time that he was arrested in February 2001 until Henry's trial, he had "no contact" with anyone involved in the conspiracy, including Soto. The prosecutor therefore did not mischaracterize McMullan's testimony.

Henry's final evidentiary argument is that the prosecutor mischaracterized the amount of cocaine that was in each concert speaker. The transcript of the prosecutor's closing argument includes the following statement made to the jury: "We know that there were 250 kilograms per speaker." No evidence from the record supports that number. The transcript, however, contains several typographical errors, and the government suggests that the prosecutor actually said that there were 50 kilograms of cocaine per speaker, not 250 kilograms. At the time of the disputed statement, the prosecutor was discussing the special verdict form that required the jury to determine whether "150 kilograms or more" of cocaine was at issue in Henry's case. The prosecutor stated: "We know that there were [some number, either 50 or 250] kilograms per speaker, and a minimum of two speakers, sometimes three speakers on each trip. We know that three speakers on the last trip dealt with 150 kilograms." Then, after discussing one speaker, the prosecutor referenced two additional speakers that had been found during the February 15, 2000 seizures and said "that is another 100 kilograms right there."

An examination of the entirety of the prosecutor's statements about the quantity of cocaine makes clear that the prosecutor was discussing a total of 150 kilograms of cocaine distributed among three speakers in quantities of 50 kilograms each. The alleged error was therefore either typographical or was isolated and unintentional, and was further limited by the fact that the special-verdict form the jury received clarified that the jury was being asked to determine if "150 kilograms or more" were involved in Henry's case. In any event, after considering the context in which the alleged error was made, we conclude that the purported misstatement could not have prejudiced Henry or misled the jury. And even if the prosecutor did err, the error was unintentional and isolated and does not warrant reversal under the plain-error standard of review.

### 3.          *Allegations of improper vouching for witness credibility*

Henry next complains of improper vouching by the prosecutor. Improper vouching occurs when a prosecutor either (1) bluntly states a personal belief in a witness's credibility, "thereby placing the prestige of the office of the United States Attorney behind that witness," or (2) "implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Francis*, 170 F.3d 546, 550-51 (6th Cir. 1999). Henry argues that the prosecutor engaged in both forms of improper vouching with regard to Kah, as well as with Henry's coconspirators.

In his closing argument, the prosecutor noted that Kah had not been charged with any crime, and that she had relocated to Canada—where she was a citizen—and "couldn't be forced to come back to the United States to testify." The prosecutor reminded the jury that Kah said "she wouldn't really feel right until she . . . came over and told the truth." He asserted that Kah had nothing to lose if she chose not to testify about Henry receiving money or personally delivering concert speakers, and then went on to say: "Her testimony, I submit, when you discuss that, is highly credible testimony, and her testimony alone when you compare it with the Defendant's absolutely contradictory testimony on the same point, is enough to convict the Defendant."

Henry first argues that it was improper for the prosecutor to assert that Kah could not be compelled to testify because there was no evidence in the record on that point. He then asserts that the prosecutor improperly vouched for Kah's credibility by suggesting that she was a disinterested volunteer witness who could not have been compelled to appear in court, that she was more likely to be truthful because the government had nothing to offer her, and that she was motivated by a desire to tell the truth. Henry claims that the prosecutor improperly argued that Kah was a disinterested witness despite the fact that the government could have charged her as a coconspirator but did not, and despite the fact that Kah's boyfriend, Yoakum, was allowed to plead guilty to money-laundering charges rather than drug-trafficking charges. We conclude that these arguments are without merit.

At trial, Kah made clear that she came to the United States voluntarily to testify. When asked if, as a Canadian citizen living in Canada, the United States government could have forced her to come to the United States to testify, she answered "no," that the government could not do so. Kah also asserted that she was testifying because she wanted "this chapter of [her] life to be closed" and stated that, "unless I do the right thing and testify, it is never going to be closed." The prosecutor therefore did not do anything improper by arguing that Kah's presence at the trial was voluntary.

Nor did the prosecutor act improperly by explaining that the absence of a plea agreement with the government suggested that Kah lacked a reason to lie. Evidence in the record supports the prosecutor's assertions that Kah had no agreement with the government regarding her testimony. Furthermore, the prosecutor had some leeway to discuss Kah's motivation for testifying because Henry's counsel had attacked her credibility during the defense's closing argument. Although "[a]

government attorney has a duty not to express a personal opinion or belief regarding the truth or falsity of any testimony or evidence," the government may attempt to explain why, based on the facts, that witness's testimony is honest after the same has been attacked by the defense. *United States v. Hurst*, 951 F.2d 1490, 1502 (6th Cir. 1991) (citing *United States v. Young*, 470 U.S. 1, 8 (1985)).

Henry's counsel repeatedly attacked the credibility of the government's witnesses, arguing that they could not be trusted because their testimony was "bought and paid for" and that "every critical witness in this case called by the prosecution is a criminal seeking leniency." Kah's credibility was specifically attacked when defense counsel referred to the $1,500 that Kah had received from the government, and suggested that she was unreliable because she had been paid. Because Henry attacked Kah's credibility on the ground that she had received a benefit from the government, the prosecutor was entitled to explain that, although Kah received money for relocating to Canada, she had no agreement affording her any benefit for testifying at Henry's trial. Characterizing Kah as a witness who did not stand to gain anything from testifying was therefore not misleading.

The prosecutor's statement that Kah had provided "highly credible" testimony, however, was problematic. In *United States v. Francis*, 170 F.3d 546 (6th Cir. 1999), this court explained that "blunt comments" of personal belief constitute improper vouching. *Id.* at 550; *see also United States v. Bess*, 593 F.2d 749, 756 (6th Cir. 1979) (explaining that statements of clear personal belief are improper even when based on testimony advanced at trial, and are "unequivocally condemned"); *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (holding that improper vouching occurred when the prosecutor introduced his own opinion about credibility through comments including "I think he [the witness] was candid. I think he was honest.").

An improper statement of personal belief, however, is not per se reversible error. *Bess*, 593 F.2d at 754-56. The court must find that the improper statement was flagrant enough to "warrant reversal." *Francis*, 170 F.3d at 549. Here, the isolated improper vouching statement, whether accidental or deliberate, was not likely to mislead the jury or prejudice Henry. Kah's testimony was only a small part of the evidence that the jury heard relating to Henry's involvement in the conspiracy. Her knowledge of the workings of the conspiracy was limited. We therefore conclude that the improper statement was not flagrant and does not reach the level of reversible error. And because the error was not flagrant even under de novo review, the vouching statement is clearly not ground for reversal under the plain-error standard applicable here. *See Gardiner*, 463 F.3d at 459.

The remainder of Henry's vouching allegations stem from the prosecutor's references to the plea agreements and reduced sentences received by coconspirators Gatlin, Jackson, McMullan, Minniefield, and Soto. During closing argument, the prosecutor asked the jury to consider whether the plea agreements would motivate the witnesses to lie, as suggested by the defense, or rather to tell the truth because false testimony would cause the witnesses to forfeit their plea agreements. In rebuttal argument, the prosecutor clarified that only *after* the interviews did he and the FBI agent who interviewed many of the coconspirators "discuss[] and decide[] what if anything should be offered as a sentence reduction to each witness." Henry asserts that these comments improperly expressed the prosecutor's personal belief in each witness's absolute and relative credibility.

A prosecutor may "refer to the plea agreement of a testifying witness . . . [,] elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility." *Francis*, 170 F.3d at 550. But because a prosecutor might "imply, either intentionally or inadvertently, that the prosecutor is in a special position to ascertain whether the witness was, in fact, testifying truthfully," impropriety emerges where a prosecutor

explains to the jury that the prosecutor will make "a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to." *Id.*

In Henry's case, the government never suggested to the jury that, if it deemed the testimony of Henry's coconspirators to be truthful, it would make a recommendation as to their sentencing. The prosecutor instead noted that plea agreements are structured such that witnesses promise to tell the truth and stand to lose any possible benefit if their testimony is later proven to be false. This argument was a proper response to defense counsel's contention that the government's witnesses were lying in order to receive sentence reductions.

Under the "invited response" rule, a "reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 11-12 (1985). "[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* at 12-13. Henry's counsel repeatedly attacked the credibility of the government's witnesses during the trial and in closing argument, suggesting that the plea agreements and sentence reductions were a *quid pro quo* for manufactured testimony. The prosecutor's response was reasonable in light of the attacks, explaining that the government interviewed the coconspirators to learn what they knew well before making any decision to offer them a plea agreement or to reduce their sentences because of their testimony in Henry's case. Because a prosecutor is entitled to explain the efforts made to ensure truthful testimony by a witness whose credibility has been attacked, the prosecutor's statement did not constitute improper vouching. *See United States v. Hurst*, 951 F.2d 1490, 1502 (6th Cir. 1991) (concluding that, in response to attacks on the credibility of a government witness, the prosecutor was entitled to explain his efforts to ensure full and honest disclosure).

Henry properly notes, however, that the prosecutor's closing argument incorrectly claimed that the witnesses understood the terms of their plea agreement before they provided statements to the FBI agent assigned to the investigation. There is no evidence in the record to suggest that any of the coconspirators who testified at Henry's trial had reviewed their plea agreements before talking with the agent for the first time. In fact, both parties acknowledged that the coconspirators did not receive their plea agreements until months or even years after their interviews.

Henry's argument about this alleged error loses its persuasiveness when we examine the arguments in context. Even if the coconspirators did not understand the risks associated with lying at the time they first spoke with the FBI agent, they certainly had evaluated the consequences of such an action prior to the time they signed their plea agreements. Any confusion about the timing of the coconspirators' interviews and the signing of their plea agreements was remedied by comments made by the prosecutor in his rebuttal. There, the prosecutor made clear that the government offered agreements to the coconspirators in exchange for their testimony only *after* they had given their interviews. Furthermore, the coconspirators discussed the dates of their arrests, debriefings with the FBI agent, and the content of their plea agreements at trial. The plea agreements themselves were also all entered into evidence. When viewed in the context of the prosecutor's overall argument and the evidence before the jury, the statement about the witnesses understanding their plea agreements was not improper.

### 4.     *Allegations regarding shifting and reducing the burden of proof*

Henry further alleges that the prosecutor shifted and reduced the burden of proof during closing argument. Specifically, Henry points to the following statement by the prosecutor: "Ladies and gentlemen, I guess that sort of gets back to the whole point that I said in opening statement . . . listen to the testimony of the witnesses, consider how it came in, and consider if there is any way that the defense's theory could hold any water." Henry claims that the statement shifted the burden

of proof to him because it purportedly tells the jury that Henry is required to present evidence and a theory of innocence, and improperly tells the jury to weigh competing theories.

Nothing in the prosecutor's remarks, however, suggested that Henry had the burden to prove that he was innocent. In this circuit, "[i]f a defendant testifies . . . , a prosecutor may attack his credibility to the same extent as any other witness," *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999), so long as the commentary is "supported by reasonable inferences from the record" and is not based solely on the prosecutor's personal opinion. *Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001). At trial, Henry denied knowing many of his alleged coconspirators, asserted that he had no involvement in the drug conspiracy, and attacked the credibility of the government's witnesses. This allowed the government to contrast Henry's testimony with that of the numerous witnesses who testified against him and to ask the jury to decide who they believed. The district court also clearly and properly instructed the jury that the government bore the burden of establishing Henry's guilt beyond a reasonable doubt. Henry's argument that this statement by the prosecutor shifted and reduced the burden of proof is therefore without merit.

### 5.      *Allegation of an improper characterization of the reasonable-doubt standard*

In a final specific attack on his conviction, Henry argues that the prosecutor used a flagrantly improper emotional characterization of the reasonable-doubt standard in his rebuttal to Henry's closing argument. The prosecutor described the standard by saying that "you don't have a reasonable doubt if proof is so convincing that you would not hesitate to act and rely on it in the most important matters in your own lives." He then proceeded to give an "example" for the jury:

> Suppose you had your son or daughter come to you . . . just out of college and . . . they've got a great job opportunity . . . out in California, and they're going to go work for a man named Roderick Henry. And they are going to go work for Roderick Henry in the music business . . . .
>
> What do you think, ladies and gentleman? You have heard evidence from people who have criminal records. Do you know enough when your son and daughter comes to you and say great, I'm going to work for Roderick Henry, what do you tell them? Do you tell him or her, great, sounds great to me, good luck. If it was the most important decision in your life, what decision would you ask your son or daughter to make based on the evidence you heard from that witness stand?
>
> You know what your decision would be. You know your decision would be that you know enough about Roderick Henry based on the [evidence], you know, in the most important decisions in your life, you would say he is a drug dealer, don't work for him.

Henry argues that the prosecutor's example improperly suggested to the jurors that the evidence against Henry should be considered as though it involved a matter regarding the potential safety of their children. As such, he contends that the argument is a thinly veiled form of the improper "community protection argument" found to be reversible error in *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) ("A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values . . . or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984))).

But the suggestion that jurors consider what advice they would give a child who was considering a job with Henry differs from the "send a message" and "community protection"

arguments that have been condemned by the courts. The prosecutor's statements in the present case did not shift the focus away from Henry's culpability or suggest that punishing Henry would send other drug dealers in the community a message.

A more accurate characterization of the problem here is that the example used was an improper effort on the part of the prosecutor to reduce the government's burden of proof. By suggesting to the jurors that the decision of whether to convict Henry was equivalent to the decision of whether to recommend that their child take a job with Henry, the prosecutor inverted the burden of proof. In other words, the prosecutor's statement encouraged the jury to evaluate how sure they were that Henry was *not* a drug dealer, as opposed to how sure they were that he *was* guilty of the crime charged beyond a reasonable doubt.

No caring parent would recommend that their child take a job with anyone whom they remotely feared might be a drug dealer. The prosecutor's example therefore suggested that the jury should convict Henry unless they were so convinced that he was not a drug dealer that they would recommend that their child enter his employ. Such a characterization of the reasonable-doubt standard was error. We must accordingly decide whether the statement was flagrant enough to warrant reversal.

To start with, the improper example could easily have misled the jury regarding the reasonable-doubt standard in a way prejudicial to Henry. The argument was also deliberately made, even if the prosecutor did not intend to invert the burden of proof by telling the story. On the other hand, the improper example was isolated and presumably given to counter defense counsel's own examples of "major decisions" that jurors would not make unless based on facts they believed beyond a reasonable doubt.

If the evidence against Henry were less strong than it was in this case, a serious question would be presented as to whether the argument rose to the level of reversible prosecutorial misconduct. The record before us, however, demonstrates that the evidence establishing Henry's guilt was quite substantial. The government presented seven fact witnesses with personal knowledge of the conspiracy, law enforcement agents who worked on the case testified, and tapes of incriminating phone calls between Henry and a coconspirator were played. Moreover, the district court properly described the reasonable-doubt standard at length in the jury instructions, making clear that the presumption of innocence stayed with Henry "unless and until the government presents evidence here in court that overcomes the presumption and convinces you beyond a reasonable doubt that he is guilty." In addition, the court noted that the "defendant has no obligation to present any evidence at all or to prove to you in any way that he is innocent," and that the government must "prove every element of the crime charged beyond a reasonable doubt." The court also instructed the jury that they could rely only on the evidence and testimony of witnesses and not upon the statements or arguments of the lawyers.

In sum, the level of proof against Henry, the proper jury instructions, and the lack of any contemporaneous objection by defense counsel militate against a finding of reversible prosecutorial misconduct. Plain-error review is the applicable standard, and under that standard we conclude that the erroneous argument did not seriously affect the fairness, integrity, or public reputation of the trial. *See United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006); Fed. R. Crim. P. 52(b).

### 6.     *Cumulative effect of alleged misconduct*

Henry's final challenge to the fairness of his trial is based on the "cumulative effect" of all of the prosecutor's alleged misconduct as detailed above. Even if individual errors in and of themselves do not constitute reversible error, a defendant may "show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). As discussed in the preceding sections,

however, we conclude that only two of the challenged statements were improper: (1) the vouching statement made by the prosecutor regarding Christine Kah's credibility, and (2) the prosecutor's suggestion that the jury convict Henry if they would not encourage their own children to take a job working for him. The remaining challenged statements were not inappropriate.

We further conclude that the isolated improper vouching statement and the improper example of reasonable doubt do not cumulate to create uncertainty about the fundamental fairness of Henry's trial. The trial "may not have been perfect," *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000), but due process does not require absolute perfection. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). In addition, the two errors cumulatively did not "seriously affect[] the fairness, integrity, or public reputation of the judicial proceedings," and therefore do not rise to level of plain error. *See Gardiner*, 463 F.3d at 459.

## B.    Reasonableness of Henry's sentence

We now turn to the government's cross-appeal. In its cross-appeal, the government challenges the reasonableness of Henry's 180-month sentence.

### 1.    *Standard of review*

A district court's sentencing determination is reviewed "under a deferential abuse-of-discretion standard" for reasonableness. The inquiry contains both procedural and substantive components. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). We must first ensure that the district court committed no procedural error. *Id*. at 597; *United States v. Duane*, 533 F.3d 441, 450 (6th Cir. 2008). A district court necessarily abuses its sentencing discretion if it

> commit[s] [a] significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall*, 128 S. Ct. at 597.

If, and only if, the district court's sentencing decision is procedurally sound, this court will "then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard[,] . . . tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* A sentence within the applicable Guidelines range is accorded a presumption of reasonableness in this circuit. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006); *see also Rita v. United States*, 127 S. Ct. 2456, 2462 (2007). But we do not apply "a presumption of unreasonableness" to sentences, such as Henry's, that fall outside of the Guidelines range. *Gall*, 128 S. Ct. at 597.

A sentencing court has an "obligation to explain to the parties and the reviewing court its reasons for imposing a particular sentence." *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006). It must clearly "articulate its reasoning" in order to allow for a meaningful appellate review. *United States v. Kirby*, 418 F.3d 621, 626 (6th Cir. 2005). "[T]he reviewing court can intelligently determine whether the specific sentence is indeed reasonable" only where the sentencing court "communicate[s] clearly its rationale for imposing the specific sentence." *Richardson*, 437 F.3d at 554.

This obligation is especially important where the district court has significantly departed from the Guidelines range. *United States v. Poynter*. 495 F.3d 349, 357-58 (6th Cir. 2007) (discussing the importance of ensuring that district courts provide adequate reasoning for the

sentence imposed, especially when the sentence constitutes a significant departure from the Guidelines).  The Supreme Court in *Gall* declared "uncontroversial [the proposition] that a major departure should be supported by a more significant justification than a minor one," and made clear that appellate courts may "take the degree of variance into account and consider the extent of a deviation from the Guidelines."  *Id.* at 594-95, 597.  *Gall* rejects the notion, however, that extraordinary circumstances are required "to justify a sentence outside the Guidelines range," and prohibits "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595.

Post-*Gall*, this court has held that a district court's deviation from the Guidelines "require[s] some correlation between the extent of a variance and the justification for it." *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008).  If a sentencing court "decides that an outside-Guidelines sentence is warranted," the court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (quoting *Gall*, 128 S. Ct. at 597).  But the appellate courts must still "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Grossman*, 513 F.3d at 596 (quoting *Gall*, 128 S. Ct. at 597).

### 2.    *Henry's sentencing hearing*

After hearing arguments from both parties, the district court determined that the appropriate Guidelines sentencing range was between 324 and 405 months of imprisonment.  The court then heard testimony from four witnesses who appeared on Henry's behalf—his wife, his father, a sister, and a nephew.  Henry asked for the statutory minimum sentence of 10 years based upon (1) the concept of lingering doubt about whether he had been justly convicted, (2) his "exemplary life," (3) the impact on his family, (4) the assertion that a 10-year sentence was more than sufficient to deter him from ever committing any future crime, and (5) the disparity in Henry's sentencing exposure as compared with his coconspirators.  The government, on the other hand, requested a sentence within the Guidelines range of between 324 and 405 months' imprisonment on the basis of the testimony indicating that Henry was a leader in the conspiracy to distribute upwards of 800 kilograms of cocaine.  It also pointed out that Henry had taken steps to insulate himself from prosecution and that his sentence should not be compared with others who cooperated with law enforcement during the investigation.

At sentencing, the district court acknowledged not only the discretionary nature of the Guidelines, but the court's duty to impose a sentence "sufficient but not greater than necessary" to comply with the factors set forth in 28 U.S.C. § 3553(a).  It then enumerated each of the § 3553(a) factors and discussed their general meaning and import.  Ultimately, the district court sentenced Henry to 180 months in prison and five years of supervised release. Henry's sentence was thus set at 144 months—or 12 years—below the bottom of the applicable Guidelines range.

But the district court failed to explain how the § 3553(a) factors specifically applied to Henry's non-Guidelines sentence or articulate why the sentence constituted an adequate punishment in Henry's case.  In fact, immediately after acknowledging its authority to fashion an appropriate sentence, the court noted that Henry was "somebody who was running the show," and discussed the fact that the Guidelines and the high sentences imposed for drug crimes reflect a determination by lawmakers that there should be harsh penalties for drug dealers in order to deter people "from engaging in the kind of devastation that happens in our communities because of drugs."  Such statements call into question the court's determination to impose a sentence substantially below the applicable Guidelines range.

Moreover, the district court never mentioned the huge quantity of cocaine at issue in Henry's case. And despite the court's acknowledgment that it was required to consider the issue of disparity, it failed to provide any discussion of the disparity between Henry and either his coconspirators or similarly situated drug dealers. The only information specific to Henry in the court's entire discussion at sentencing was Henry's leadership role in the conspiracy, his decision not to plead guilty, and his strong family and community support.

Although the imposition of an appropriate sentence is the province of the district court, appellate courts must have sufficient information about the justifications offered for the sentence imposed in order to conduct a meaningful review. *Kirby*, 418 F.3d at 626. This court recently noted when discussing post-*Booker* appellate review of outside-the-Guidelines sentences that, "[a]s a practical matter, the most meaningful way for appellate courts to 'iron out sentencing differences,' and to 'avoid excessive sentencing disparities while maintaining flexibility to individualize sentences where necessary,' is to permit them to account for the strength of the sentencing court's explanation in relation to the size of its deviation from the guidelines." *United States v. Poynter*, 495 F.3d 349, 358 (6th Cir. 2007) (quoting *Booker*, 543 U.S. at 263, 264-65).

As *Poynter* explained, there is no "better way . . . to ensure that a sentence is 'sufficient' (in the context of a proposed substantial downward variance) . . . than to insist that the district courts explain such variances from the Sentencing Commission's recommendations—the only empirical guide to whether sentences are 'sufficient . . . .'" *Id.* at 358-59. In sum, there is no means for "judges [to] avoid such disparities in the first instance, or correct them on review, without demanding that substantial variances be supported by substantial reasons." *Id.* at 357.

### 3.     *Substantive reasonableness of Henry's sentence*

The sentence in the present case may or may not be reasonable. We cannot tell because the district court failed to adequately explain its reasoning or to meaningfully articulate why Henry was entitled to the greatly reduced sentence that he received. We therefore vacate the sentence imposed below and remand the case for resentencing.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Henry's conviction, but **VACATE** his sentence and **REMAND** the case to the district court for resentencing consistent with this opinion.