NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0547n.06

Case No. 18-2318

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Oct 29, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| EDITHA MANZANO, | ) | MICHIGAN |
|  | ) |  |
| Defendant-Appellant. | ) |  |

BEFORE: GUY, BUSH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Most home health agencies perform a valuable function. They provide nursing or therapy services to homebound patients at their homes, thereby relieving the patients of the burden to travel to medical facilities for care. In this case, however, Editha Manzano operated her home health agency, Anointed Care Services, for a different purpose—to defraud Medicare. She asserts various constitutional and evidentiary challenges to her fraud convictions. We affirm.

I.

The federal Medicare program pays medical providers for "home health services," which include skilled nursing, physical therapy, occupational therapy, and speech and language pathology services. These home health services are more labor-intensive than similar services

provided in medical facilities, so the Medicare program typically reimburses them at a higher rate. Yet Medicare allows home health agencies to provide the services only to qualifying patients who have difficulty getting out of their homes. For a patient to receive the services, then, a physician must certify that the patient needs them and that the patient is "homebound."

Before 2013, Editha Manzano worked as the director of nursing at a home health agency called Alpha. She convinced Mark Buenaflor, a physical therapist, to take a job there. Buenaflor soon realized that Alpha was defrauding Medicare because only a few of his patients needed home health services and most were not homebound. Dr. Roberto Quizon acted as the physician referral source for Alpha. Alpha would identify potential "patients" for home health services, he would "refer" those patients to Alpha, and Alpha would pay him a fee for each referred patient. Quizon certified practically all of Alpha's patients for home health services, but he believed that only a tiny fraction needed them.

In 2013, Manzano told Buenaflor that she wanted to leave Alpha because she did most of the work but did not receive enough of the money. She thus acquired Anointed Care Services with Liberty Jaramillo (her romantic partner) and Buenaflor. Manzano was the president, Jaramillo was the vice president, and Buenaflor managed physical-therapy services. Operations continued at Anointed largely as they had at Alpha. Manzano and Buenaflor brought many of their former Alpha patients to Anointed. Many of these patients did not, in fact, need home health services. Manzano also convinced Dr. Quizon to take the title of "medical director" at Anointed and to refer patients to that company, again in return for a per-patient fee.

To get patients to participate, Manzano paid them cash. Monica Simmons was a typical patient. She met with Manzano on several occasions to sign blank Medicare forms in exchange for $100. Even though Simmons signed up for home health services, she had no trouble leaving

her home. So she refused services when Anointed staff came to provide them. Other patients told similar stories about their interactions with Anointed. They signed blank forms in exchange for money to obtain home health services that they did not need (and often did not receive). To help track down new patients, Manzano also paid patient "recruiters" a per-patient fee.

From November 2013 to April 2016, Anointed received over $1.5 million in payments from Medicare. A citizen eventually complained about Anointed, and the FBI began an investigation. The FBI seized various pieces of incriminating evidence from Anointed's offices, including nursing-visit notes that were pre-signed by patients but otherwise blank.

In 2016, the United States indicted Manzano. It charged her with one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349, one count of conspiracy to pay healthcare kickbacks in violation of 18 U.S.C. § 371, and three counts of healthcare fraud in violation of 18 U.S.C. § 1347. Buenaflor, Quizon, Anointed staff, patients, and patient recruiters all testified about the fraud. A jury convicted Manzano on all counts. The court sentenced her to a total term of 84 months' imprisonment. She now appeals.

## II.

Manzano asserts that the government committed misconduct—so much so that it violated the Due Process Clause—through several alleged evidentiary errors: (1) eliciting improper opinion testimony from lay witnesses; (2) using prior "bad acts" evidence; and (3) asking questions that generated irrelevant answers.

We could make short work of this claim if it were based on the Constitution alone. The government does not violate the Due Process Clause every time it violates a Federal Rule of Evidence. *See, e.g.*, *Key v. Rapelje*, 634 F. App'x 141, 148 (6th Cir. 2015); *Wade v. White*, 120 F. App'x 591, 594 (6th Cir. 2005). Those rules exist to provide protections greater than the

constitutional floor. And it disserves defendants to highlight lofty constitutional claims at the expense of ordinary rules-based arguments, because the former typically require a much more demanding showing than the latter. As another court has said, "[l]awyers all too often invoke the Constitution as if it were a panacea and bypass seemingly mundane arguments based on statutes and regulations. Mimicking Gresham's Law, flabby constitutional generalities drive out sound legal points." *United States v. Vargas*, 915 F.3d 417, 420 (7th Cir. 2019) (citation omitted).

This case provides an example. A claim that prosecutorial misconduct violated the Due Process Clause generally requires flagrant improprieties that are extensive and intentional. *Compare Berger v. United States*, 295 U.S. 78, 84–89 (1935), *and United States v. Acosta*, 924 F.3d 288, 299–309 (6th Cir. 2019), *with Darden v. Wainwright*, 477 U.S. 168, 179–82 (1986). Even when, for example, a prosecutor made repeated inflammatory comments—such as calling the perpetrator of the crime an "animal"—the Supreme Court held that the remarks did not rise to the level of a constitutional violation. *Darden*, 477 U.S. at 179–82, 180 n.12. In this case, Manzano's alleged evidentiary errors—even when considered collectively—fall well short of this high bar. "Asking questions that call for answers that may be deemed inadmissible on relevancy grounds does not amount to prosecutorial misconduct that rises to the level of a due-process violation." *Simmons v. Woods*, No. 16-2546, 2018 WL 618476, at *4 (6th Cir. Jan. 30, 2018).

Giving Manzano the benefit of the doubt, we assume that she also independently asserts violations of the Federal Rules of Evidence. Where, as here, a defendant fails to object to an evidentiary ruling in the district court, we will review the ruling only for plain error. *See United States v. Young*, 847 F.3d 328, 349 (6th Cir. 2017). The defendant must show that "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public

reputation of the judicial proceedings." *United States v. Henry*, 545 F.3d 367, 376–77 (6th Cir. 2008) (citation omitted). "Only in exceptional circumstances in which the error is so plain that the trial judge and prosecutor were derelict in countenancing it will this court reverse a conviction under the plain-error standard." *Id.* at 377 (citation omitted).

We now turn to each of the three alleged evidentiary errors.

1. *Lay Opinions*. Manzano initially asserts that the government wrongly introduced lay opinion testimony in violation of Rule 701 of the Federal Rules of Evidence. That rule permits a nonexpert to give an opinion if it is "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(a)–(c). "In applying Rule 701, the modern trend among courts favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *United States v. Harris*, 786 F.3d 443, 446 (6th Cir. 2015) (citation omitted). Unlike expert testimony, lay testimony "results from a process of reasoning familiar in everyday life." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (citation omitted). Such testimony is "helpful within the meaning of Rule 701 when the witness has enjoyed significantly more time to study and compare the evidence than the jury." *Harris*, 786 F.3d at 448 (citation omitted).

We see no "obvious" error in the admission of the challenged testimony. *Henry*, 545 F.3d at 376. *First*, Manzano criticizes the testimony of two individuals involved in Anointed's affairs—Buenaflor (the former owner) and Laura Garland (a physical therapist). Both witnesses described the differences between "legitimate" and "fraudulent" home health agencies, and indicated that Anointed fell on the fraudulent side because it paid patients and charged for visits that did not occur. The district court did not plainly err in allowing this testimony. The court could reasonably

conclude that Buenaflor's and Garland's testimony was "rationally based on [their] perception." Fed. R. Evid. 701(a). Both were licensed physical therapists who had worked at other home health agencies before they pleaded guilty to conspiring to commit healthcare fraud at Anointed. The court also could reasonably conclude that this information would be helpful to the jury in determining what home health agencies may and may not do. Fed. R. Evid. 701(b); *see United States v. Kpohanu*, 377 F. App'x 519, 525–26 (6th Cir. 2010). And the court could reasonably conclude that this opinion testimony—that it was fraudulent to charge for services that were not, in fact, performed—was not based on any "specialized knowledge." Fed. R. Evid. 701(c); *see United States v. Kerley*, 784 F.3d 327, 336–40 (6th Cir. 2015).

*Second*, Manzano challenges the testimony of Kathleen Heuertz, who worked for a Medicare contractor that investigates healthcare fraud. She says that Heuertz gave improper lay opinions about various fraud "red flags" (such as patients who get recertified for more than one course of treatment) and about the meaning of legal terms (such as "homebound" or "kickback"). This argument presents a closer question. *Compare Kerley*, 784 F.3d at 336–40, *with White*, 492 F.3d at 400–04. On the one hand, we have said that "[t]he Medicare program operates within a complex and intricate regulatory scheme and we cannot say that the average lay person, including any Medicare beneficiary, commands a working knowledge of Medicare reimbursement procedures." *White*, 492 F.3d at 403. On the other, Heuertz's testimony involved less complicated subjects than those discussed by the fiscal-intermediary auditors in *White*. *See id.* at 399–400. Regardless, the admission of this testimony did not affect Manzano's "substantial rights." *Henry*, 545 F.3d at 376. Much of Heuertz's testimony provided simple background facts (not opinions) about the Medicare program. *See Young*, 847 F.3d at 351. And the government presented

"overwhelming evidence" of Manzano's guilt, including testimony from many of her coworkers at Anointed and from patients and patient recruiters. *See White*, 492 F.3d at 405.

*Third*, Manzano challenges a portion of FBI Special Agent Andrew Crump's testimony about the evidence recovered from a search of Anointed. Crump described the nursing-visit notes that patients had pre-signed as a fraud "red flag." The district court did not commit "obvious" error in allowing this testimony. *Henry*, 545 F.3d at 376. The "indicators of fraud" that Crump described were within his personal knowledge and required no specialized knowledge. *See United States v. Variste*, 625 F. App'x 458, 459–60 (6th Cir. 2015).

2. *"Bad Acts" Evidence*. Manzano next challenges the government's use of evidence about her prior work at Alpha. Federal Rule of Evidence 404(b)(1) generally bars the government from introducing evidence of a defendant's prior "bad acts" to show that it was more likely that the defendant committed the crime at issue. *See United States v. Potter*, 927 F.3d 446, 452 (6th Cir. 2019). Yet an exception allows the government to use this evidence for other purposes—to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Here, even if the evidence concerning fraud at Alpha falls within Rule 404(b)(1)'s ban, the district court did not commit "obvious" error in finding it admissible under Rule 404(b)(2)'s exception. *Henry*, 545 F.3d at 376. We have already recognized that close-in-time fraud at other medical facilities may show the defendant's intent to participate in the indicted healthcare fraud. *See United States v. De Oleo*, 697 F.3d 338, 343 (6th Cir. 2012). That same logic applies here.

In response, Manzano calls this Alpha evidence irrelevant. Not so. "[A]s evidence experts have long recognized, a prior 'bad act' satisfies the relevancy test's low bar even when used to show a person's propensity to commit the indicted crime," which is "why a separate rule" (Rule

404(b)) regulates the use of "bad acts" evidence. *Potter*, 927 F.3d at 452 (citing 1 John H. Wigmore, *Evidence in Trials at Common Law* § 55, at 122–23 (1st ed. 1904)). Manzano next says that the probative value of this evidence was outweighed by its potential for unfair prejudice under Rule 403. But the evidence was highly probative in that it was "both similar to, and close in time with, the indicted conduct." *Id.* Indeed, Manzano brought many of the same fraudulent patients and patient recruiters from Alpha to Anointed. And given the relatively infrequent attention that the government paid to Alpha during the trial, we cannot say that the risk of unfair prejudice was "clear." *Henry*, 545 F.3d at 376.

3. *Improper Bolstering*. Manzano lastly argues that the prosecutor improperly asked Special Agent Crump to describe the process for seeking the warrant used to search Anointed because it led the agent to discuss irrelevant matters—the need for probable cause and for a judge's approval to obtain a warrant. That discussion, Manzano adds, would have improperly bolstered the jury's perception of the government's case.

We again see no "obvious" error from this short exchange between the prosecutor and Agent Crump. *Henry*, 545 F.3d at 376. Under the relevancy rules, "[e]vidence which is essentially background in nature . . . is universally offered and administered as an aid to understanding." Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules. And courts have found that a witness's discussion of the "investigative process" falls within this general principle. *United States v. Littlewind*, 680 F. App'x, 496, 498 (8th Cir. 2017) (per curiam); *see also Young*, 847 F.3d at 351–52; *United States v. Allen*, 403 F. App'x 800, 802 (4th Cir. 2010) (per curiam). Here, the district court could reasonably conclude that Crump's testimony described relevant background facts (under Rules 401 and 402) and did not unduly prejudice Manzano (under Rule 403).

To support her contrary claim, Manzano cites a single case: *Fair v. Franklin County*, No. 98-4237, 2000 WL 659418 (6th Cir. May 11, 2000). There, an officer testified about the meaning of probable cause (not the need for probable cause) during a civil-rights trial in which the presence or absence of probable cause was the critical question (not a background fact). *Id.* at \*1–2. Ultimately, the court did not even opine on whether the district court had properly allowed this officer testimony because it found the testimony harmless in any event. *Id.* at \*4.

III.

Alternatively, Manzano argues that her trial counsel provided ineffective assistance in violation of the Sixth Amendment. She alleges that her counsel had a conflict of interest because he represented her while under investigation by the State Bar of Michigan for another matter. She also contends that her counsel wrongly failed to raise the evidentiary objections that she now asserts on appeal. To support these claims, Manzano asks us to take judicial notice of her counsel's 90-day suspension and of her daughter's affidavit describing his allegedly improper representation.

"[A]s a general rule, ineffective-assistance claims 'are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue.'" *United States v. Buchanan*, 933 F.3d 501, 513 (6th Cir. 2019) (citation omitted). We review these claims on direct appeal only in "rare circumstances," *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012), because the record is typically not "adequately developed," *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000). When an ineffective-assistance claim hinges on evidence outside the record, a § 2255 motion allows the defendant to introduce the evidence in the district court "in the first instance." *Sypher*, 684 F.3d at 626. A defendant, by contrast, takes a big risk by raising an ineffective-assistance claim on direct appeal that requires further factual development to have any chance of success. If we were to reject the

9

claim on the merits based on the inadequate record, the defendant generally cannot relitigate the claim again in a later § 2255 motion. *See Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *cf. United States v. Flores*, 739 F.3d 337, 341–42 (7th Cir. 2014).

Our general rule—reserving ineffective-assistance claims for a § 2255 motion—is the proper course here. Manzano's attempt to introduce new evidence on appeal confirms that her claims require further factual development. So we decline to consider the claims now. That decision keeps the door open for Manzano to pursue them "through the more traditional method of a collateral proceeding." *United States v. Walden*, 625 F.3d 961, 967 (6th Cir. 2010).

We affirm the district court's judgment and deny Manzano's motion to take judicial notice.