[Cite as *State v. Lambert*, 2015-Ohio-4018.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-L-096** |
| MARVIN DALE LAMBERT, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 14 CR 000081.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer,* Lake County Public Defender, and *Vanessa R. Clapp,* Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

COLLEEN MARY O'TOOLE, J.

{¶1} Marvin Dale Lambert, Jr., appeals from the judgment of the Lake County Court of Common Pleas, entered on a jury verdict, sentencing him to serve 15 years imprisonment to life for the murder of John Funari. Finding no error, we affirm.

{¶2} Mr. Lambert and Mr. Funari lived at the Madison Inn, a group of six efficiency apartments in Madison Township, Ohio. Other residents included Dale

Vanderlip, who lived next to Mr. Funari; Mr. Lambert's uncle, Allen Gray; and James Fogel. One apartment was empty.

{¶3} Unfortunately, Mr. Funari suffered from paranoid schizophrenia. He appears to have been a quiet young man, who attended his medical appointments, and talked almost daily with his mother, Nancy Stanek, who handled his finances and sent him gifts of money. He was generally well-liked. Mr. Lambert was his best friend. They spent most of their days together, generally in Mr. Funari's apartment.

{¶4} January 9, 2014, Mr. Funari went to a medical appointment in the morning. His mother had sent him $50 the day before. On returning to his apartment, he lent Mr. Lambert a small sum, so the latter could buy bread, beer, energy pills, and cigarette tubes at the local market.

{¶5} Later that afternoon, Mr. Vanderlip heard Mr. Funari and Mr. Lambert arguing in Mr. Funari's apartment. He heard Mr. Lambert yell at Mr. Funari, then leave the apartment. A little while later, Mr. Vanderlip heard Mr. Lambert return to Mr. Funari's, and begin yelling. Mr. Vanderlip heard banging, and the sound of items being tossed. He texted the apartment manager, Lydia Laiosa, to inform her. As he did so, he heard a loud bang against the wall separating his apartment from Mr. Funari's, followed by complete silence. Someone then left the apartment, slamming the door. Mr. Vanderlip assumed it was Mr. Lambert, who habitually slammed the door, and since the footsteps he heard headed toward Mr. Lambert's apartment. Later that night, he heard footsteps in the bushes, and looked out, but did not see anyone. He did notice the air conditioning unit for Mr. Funari's apartment had been removed from the window, and placed on the ground.

{¶6} Over the next two days, Mr. Vanderlip heard the sound of the radio and television constantly from Mr. Funari's apartment. He found this unusual, since Mr. Funari usually turned these off when he was not there, or sleeping. January 11, 2014, Mr. Vanderlip again texted Ms. Laiosa, the apartment manager, about the sound. She entered the apartment, and found Mr. Funari's body lying on the floor, face up. The police were contacted immediately.

{¶7} The police found the apartment in disarray, with items strewn about. Mr. Funari's body was cold, and he had no pulse. There was dried blood on his face and bruising on his neck. The bed was out of angle with the wall. There were no signs of forced entry. Responding paramedics concluded Mr. Funari had been dead at least 36 hours.

{¶8} Forensic scientists with the Cuyahoga County Medical Examiner found hair on Mr. Funari's right palm. They could exclude Allen Gray and Dale Vanderlip as sources for the hair, but not Mr. Lambert.

{¶9} Dr. Andrea McCollum conducted the autopsy, and found strangulation to be the cause of death. There were numerous injuries to the body. Dr. McCollum concluded these all occurred close to the time of strangulation.

{¶10} Criminalist David Green of the Lake County Regional Forensic Laboratory compared bruising on Mr. Funari's neck to his bed railing, and could not eliminate the railing as the source of the bruising due to similar width.

{¶11} Erica Ames, a Forensic Examiner for the F.B.I. Laboratory in Quantico, Virginia, compared the mitochondrial DNA profiles of hairs found on Mr. Funari's hand with those of his neighbors. Ms. Ames could not exclude Mr. Lambert as a donor.

{¶12} Dr. Karen Zavarella of the Lake County Regional Forensic Laboratory also did DNA testing. She found that three beer bottles from Mr. Funari's apartment had Mr. Lambert's DNA on them. Boots had been found near Mr. Funari's head, with blood on them. The blood matched Mr. Funari's. His DNA, and Mr. Lambert's, were also on the boots.

{¶13} Several people had noticed Mr. Funari's pants were in an unusual position, with the belt and zipper skewed to the right. Dr. Zavarella found both Mr. Funari's and Mr. Lambert's DNA on the pants.

{¶14} Dr. Zavarella swabbed beneath Mr. Funari's fingernails, and found some of Mr. Lambert's DNA there. She testified that it is rare to find another person's DNA under fingernails, unless scraping had occurred.

{¶15} Mr. Lambert was interviewed by the police several times on January 11, 2014, the day the body was discovered. He had bruising and swelling on his face, which he attributed to tussling with a niece. Initially, he denied fighting with Mr. Funari. He said they had been together on January 9, and that he eventually went home to bed. In his second interview, he said he went to Mr. Funari's at around 12:00 p.m. or 1:00 p.m., borrowed ten dollars, and went to the store to buy the cigarette tubes and beer. He said Mr. Funari planned to see a friend named "Bill" later. Mr. Lambert always maintained Mr. Funari was fine when he last saw him.

{¶16} In an interview in early February 2014, Mr. Lambert admitted that he went to Painesville to buy marijuana in the evening of January 9, but again insisted he never argued with or touched Mr. Funari that day.

4

{¶17} Police examined Mr. Lambert's phone records. These revealed numerous phone calls and texts between him and a friend named "Charlie" between 5:00 p.m. and 8:00 p.m. on January 9, 2014. Mr. Lambert needed a ride. The records indicated he was near the Madison Inn until the early evening, and later, in Painesville.

{¶18} Mr. Funari's last phone call was to Mr. Lambert at 12:05 p.m., January 9, 2014.

{¶19} February 10, 2014, Mr. Lambert was charged by way of secret indictment with two counts of murder, in violation of R.C. 2903.02(A) and (B), respectively. He waived the right to be present at his arraignment, and the trial court entered pleas of not guilty on his behalf. Jury trial commenced August 18, 2014, and concluded August 25, 2014, Mr. Lambert being found guilty on both counts. By a judgment entry filed September 2, 2014, the trial court merged the second count into the first for sentencing purposes, and ordered Mr. Lambert to serve 15 years to life in prison. This appeal timely ensued, Mr. Lambert assigning four errors. The first reads:

{¶20} "The trial court's denial of defense counsel's mid-trial motion for a competency reevaluation violated the defendant-appellant's rights to due process and fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Sections 5 and 10, Article I of the Ohio Constitution."

{¶21} Mr. Lambert received two competency examinations prior to trial, one by Dr. Jeffrey Rindsberg, the court-appointed psychologist, and one by Northcoast Behavioral Healthcare. Each found him to be competent to stand trial. School records revealed that Mr. Lambert was average or above average in all academic areas, but frequently failed due to not completing assignments and disruptive behavior. Dr.

Rindsberg noted that Mr. Lambert is prone to acute mental decompensation at times of stress. He found Mr. Lambert is prone to agitation and irritability.

{¶22} At trial, Mr. Lambert acted in an erratic fashion. At one point he stood up. He stated he did not wish to be in court, or hear testimony. He demanded his assistant counsel remove his glasses. Out of the hearing of the jury, the trial court observed that Mr. Lambert was watching assistant defense counsel's pens and pencils closely, and that the trial court was concerned he might grab one and poke counsel in the eye. Eventually, the trial court had Mr. Lambert removed to a conference room, to watch the trial from there. Deputies eventually reported they had to put him in a holding cell, after he slammed his head into the wall, and tried to bite an officer. He pulled out some of his hair, screaming he wanted a haircut, but that the barber would kill him. The next day, when the trial court again allowed him into the courtroom, he had another outburst, and was sent to the conference room for the remainder of trial.

{¶23} At one point, defense counsel suggested that Dr. Rindsberg have a brief meeting with Mr. Lambert, to see if he still considered him competent. However, he never moved the court for a reevaluation, and the trial court put on record its determination that, while full of anger, Mr. Lambert was competent, and was acting out in an attempt to postpone trial.

{¶24} "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial. See *Pate v. Robinson* (1966), 383 U.S. 375, * * *; and *Drope v. Missouri* (1975), 420 U.S. 162, * * *. In *Pate*, *supra*, the United States Supreme Court held that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial

6

deprives the defendant of the right to a fair trial. In *Dusky v. United States* (1960), 362 U.S. 402, * * *, the United States Supreme Court set forth the test to determine whether a defendant is competent to stand trial, stating that '(* * *) the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him."' See, also, *Drope*, *supra*, 420 U.S. at 172, * * *. The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial. See *Drope*, *supra*, 420 U.S. 162, * * *; *Pate*, *supra*, 383 U.S. 375, * * *; and *State v. Bock* (1986), 28 Ohio St.3d 108, 110, * * *." (Parallel citations omitted.) *State v. Berry*, 72 Ohio St.3d 354, 359 (1995).

**{¶25}** R.C. 2945.37(B) provides if the issue of a defendant's competency is raised during trial, "the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." We review a trial court's decision to grant or deny a mid-trial competency hearing for abuse of discretion. *Berry*, *supra*, at 360. Regarding this standard, we recall the term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.)

7

**{¶26}** Initially, we note the defense never actually moved the trial court for a new competency evaluation: it merely suggested Dr. Rindsberg speak briefly with Mr. Lambert, to see if he stood by his prior evaluation. Lead defense counsel actually admitted he thought his client was probably competent. Incompetency cannot be equated with mental or emotional instability. *State v. Murphy*, 173 Ohio App.3d 221, 2007-Ohio-4535, ¶29 (12th Dist.) Calculated rudeness, outbursts in court, and abuse of defense counsel do not necessarily support a finding of incompetence. *See generally State v. Hadden*, 11th Dist. Trumbull No. 2008-T-0029, 2008-Ohio-6999. In this case, the trial court based its determination not merely on the two prior reports, but its review of Mr. Lambert's interrogations, and its own observation of his conduct throughout the proceedings. Altogether, we do not find it abused its discretion in failing to order a mid-trial competency evaluation.

**{¶27}** The first assignment of error lacks merit.

**{¶28}** The second assignment of error reads: "Prosecutorial misconduct in closing argument deprived the defendant-appellant of his rights to due process and fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Sections 5 and 10, Article I of the Ohio Constitution." Mr. Lambert argues the state impermissibly attempted to shift the burden of proof. In support, he cites the following statements by the prosecutor in rebuttal:

**{¶29}** "[Defense counsel] had this reasonable doubt poster, and its proof of such character that an ordinary person is would (sic) be willing to rely and act upon it in the most important (sic) of their own affairs. And when I like to think of the most important of your own affairs, perhaps in trusting a loved one to be watched by someone when

you're not there. Whether it be an infant who can't tell you what's happening when you're gone. Special needs child who can't tell you what's going on when you're gone. And (sic) elderly parent who can't tell you what's going on when you're gone. The most important of one's own affairs. The type of proof, the type of character that you'd be willing to rely on when you make that decision, am I leaving this person to watch my loved one. And you get information that, you know, there's an accusation that the person who wants that job did something horrible. Did something very horrible. And being fair-minded folks you'd say well, let me hear what that information is."

{¶30} After reviewing, item by item, the evidence against Mr. Lambert, especially the scientific evidence, the prosecutor then said:

{¶31} "I submit to you that person's not getting that job. Even if you did what the Defense did, wants you to do, and take everything on its own, still not getting that job. But sure as hell not getting (sic) when you include everything together."

{¶32} The defense objected to this characterization of the reasonable doubt standard, and requested a curative instruction. Following argument, the trial court denied this request.

{¶33} "The test for prosecutorial misconduct during closing argument is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused. *State v. Siefer*, 3d Dist. Hancock No. 5-09-24, 2011-Ohio-1868, ¶ 46, citing *State v. White*, 82 Ohio St.3d 16, 22, * * * (1998). We evaluate the allegedly improper statements in the context of the entire trial. *State v. Treesh*, 90 Ohio St.3d 460, 464, * * * (2001), citing *State v. Keenan*, 66 Ohio St.3d 402, 410, * * * (1993). An improper comment does not affect a substantial right of the

9

accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *Id.*, citing *State v. Smith*, 14 Ohio St.3d 13, 15, * * * (1984)." (Parallel citations omitted.) *State v. McGuire*, 3rd Dist. Allen No. 1-13-47, 2015-Ohio-1887, ¶82.

**{¶34}** The state may not shift the burden of proof in a criminal case. *State v. Johnson*, 3rd Dist. Allen No. 1-13-45, 2014-Ohio-4750, ¶120 (Rogers, J., concurring). As support for his contention the state did so in this case, Mr. Lambert cites to the decision in *United States v. Henry*, 545 F.3d 367 (6th Cir.2008). In that case, defendant was accused of operating a large scale cocaine operation, transporting the drug in music tour buses. *Id.* at 372. Defendant considered the following statement by the prosecution regarding reasonable doubt an attempt to shift the burden of proof:

**{¶35}** "Suppose you had your son or daughter come to you (. . .) just out of college and (. . .) they've got a great job opportunity (. . .) out in California, and they're going to go work for a man named Roderick Henry. And they are going to go work for Roderick Henry in the music business (. . .).

**{¶36}** "What do you think, ladies and gentleman? You have heard evidence from people who have criminal records. Do you know enough when your son and daughter comes to you and say great, I'm going to work for Roderick Henry, what do you tell them? Do you tell him or her, great, sounds great to me, good luck. If it was the most important decision in your life, what decision would you ask your son or daughter to make based on the evidence you heard from that witness stand?

**{¶37}** "You know what your decision would be. You know your decision would be that you know enough about Roderick Henry based on the (evidence), you know, in

10

the most important decisions in your life, you would say he is a drug dealer, don't work for him." *Henry* at 382-383.

{¶38} The Sixth Circuit did not find this an attempt to shift the burden of proof. Rather, in relevant part, it held:

{¶39} "A more accurate characterization of the problem here is that the example used was an improper effort on the part of the prosecutor to reduce the government's burden of proof. By suggesting to the jurors that the decision of whether to convict Henry was equivalent to the decision of whether to recommend that their child take a job with Henry, the prosecutor inverted the burden of proof. In other words, the prosecutor's statement encouraged the jury to evaluate how sure they were that Henry was *not* a drug dealer, as opposed to how sure they were that he *was* guilty of the crime charged beyond a reasonable doubt.

{¶40} "No caring parent would recommend that their child take a job with anyone whom they remotely feared might be a drug dealer. The prosecutor's example therefore suggested that the jury should convict Henry unless they were so convinced that he was not a drug dealer that they would recommend that their child enter his employ. Such a characterization of the reasonable-doubt standard was error. We must accordingly decide whether the statement was flagrant enough to warrant reversal.

{¶41} "To start with, the improper example could easily have misled the jury regarding the reasonable-doubt standard in a way prejudicial to Henry. The argument was also deliberately made, even if the prosecutor did not intend to invert the burden of proof by telling the story. On the other hand, the improper example was isolated and presumably given to counter defense counsel's own examples of 'major decisions' that

11

jurors would not make unless based on facts they believed beyond a reasonable doubt."
(Emphasis sic.) *Henry* at 383.

{¶42} The statement by the prosecutor in this case may be distinguished from that made in *Henry*. In *Henry*, the Sixth Circuit found the prosecutor's appeal was to the emotions of the jurors, and improper, since it suggested they should find the defendant guilty unless they were certain he was *not* a drug trafficker. In this case, when describing reasonable doubt, the prosecutor certainly placed in front of the jury an emotional example of evidence on which they would rely in a major personal decision: i.e., whether a defendant could be trusted taking care of an infant, or incompetent person. However, he then continued by detailing the evidence against Mr. Lambert, especially the extremely strong scientific evidence, and noting that it all had to be considered together, not piece by piece. This was in response to defense counsel's arguments that no single piece of evidence against Mr. Lambert was sufficient to find him guilty beyond a reasonable doubt. Finally, the prosecutor summed up by saying the jurors would not give a job of trust to a person with that totality of criminal evidence against him. Thus, the objectionable argument by the prosecution in *Henry* invited the jury to find the defendant guilty unless they were sure he was not: the argument objected to in this case urged the jury to consider all of the discreet pieces of evidence against Mr. Lambert as a whole.

{¶43} Further, the statement in this case, like that in *Henry,* was made in rebuttal, following defense counsel's own characterization of the reasonable doubt standard. And like in *Henry*, the trial court gave a correct reasonable doubt instruction. *Id.* at 384.

**{¶44}** Ultimately, the Sixth Circuit did not find the prosecutor's statement reversible error. Neither do we, in this case.

**{¶45}** The second assignment of error lacks merit.

**{¶46}** Mr. Lambert's third assignment of error reads: "The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A)." The grant or denial of a Crim.R. 29(A) motion is premised on the sufficiency of the evidence. Mr. Lambert's fourth assignment of error reads: "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence." We consider these assignments of error together.

**{¶47}** In *State v. Arcaro* 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶30-32, we stated:

**{¶48}** "'"(S)ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury,' i.e., '(w)hether the evidence is legally sufficient to support the jury verdict as a matter of law.' *State v. Thompkins,* 78 Ohio St.3d 380, 386, * * * (1997), quoting Black's Law Dictionary (6 Ed.1990) 1433. In reviewing the sufficiency of the evidence to support a criminal conviction, '(t)he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' *State v. Jenks*, 61 Ohio St.3d 259, * * * (1991), paragraph two of the syllabus.

**{¶49}** "Weight of the evidence, in contrast to its sufficiency, involves 'the inclination of the greater amount of credible evidence.' (Citation omitted.) (Emphasis

deleted.) *Thompkins* at 387. Whereas the 'sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, (* * *) weight of the evidence addresses the evidence's effect of inducing belief.' (Citation omitted.) *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, * * * ¶ 25. 'In other words, a reviewing court asks whose evidence is more persuasive – the state's or the defendant'?' *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, 'in resolving conflicts in the evidence, the (trier of fact) clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' (Citation omitted.) *Thompkins* at 387.

{¶50} "'Since there must be sufficient evidence to take a case to the jury, it follows that "a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency."' (Emphasis sic.) *Willoughby v. Wutchiett*, 11th Dist. No. 2002-L-165, 2004 Ohio 1177, ¶ 8, quoting *State v. Roberts*, 9th Dist. No. 96CA006462, 1997 Ohio App. LEXIS 4255, *5 (Sept. 17, 1997); *Thompkins* at 388 ('(a) reversal based on the weight of the evidence (* * * ) can occur only after the State both has presented *sufficient evidence* to support conviction and has persuaded the jury to convict') (emphasis sic), quoting *Tibbs v. Florida*, 457 U.S. 31, 42-43, * * * (1982)." (Emphasis sic.) (Parallel citations omitted.)

{¶51} Thus, if Mr. Lambert's convictions are supported by the manifest weight of the evidence, they are founded on sufficient evidence.

{¶52} Mr. Lambert was charged with murder under R.C. 2903.02 which provides, in relevant part:

**{¶53}** "(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

**{¶54}** "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶55}** Mr. Lambert attacks the evidence underlying his convictions on several fronts.

**{¶56}** He notes that Mr. Vanderlip never saw him enter or leave Mr. Funari's apartment on January 9, 2014, but simply heard him. The state counters that Mr. Vanderlip had known Mr. Lambert his entire life, and heard him daily in the neighboring apartment.

**{¶57}** Mr. Lambert argues Mr. Vanderlip is prejudiced against him, since the latter sustained a misdemeanor conviction for chasing Mr. Lambert with a baseball bat. The state responds his testimony is buttressed by his contemporaneous text message on January 9, 2014 to the apartment manager, Ms. Laiosa. It notes that Mr. Vanderlip cooperated fully with the state, and voluntarily gave DNA samples.

**{¶58}** Mr. Lambert argues the existence of his DNA and hair in Mr. Funari's apartment is not surprising, since he spent almost every day there. The state responds that only his DNA, and Mr. Funari's, were present – not that of the other neighbors. The state also notes his DNA was under Mr. Funari's fingernails; that Dr. Zavarella testified this would be unusual absent scratching the subject – and that Mr. Lambert had bruising and swelling on his face January 11, 2014.

**{¶59}** Mr. Lambert argues he maintained his innocence throughout his lengthy police interrogations. The state responds his story changed in significant aspects during those interrogations.

**{¶60}** The evidence in this case is circumstantial. However, "[t]he Ohio Supreme Court has held that circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Fasline*, 11th Dist. Trumbull No. 2014-T-0004, 2015-Ohio-715, ¶39. The evidence is of a quality which indicates the jury did not clearly lose it way. Mr. Lambert's convictions are not against the manifest weight of the evidence. Necessarily, therefore, they are founded on sufficient evidence.

**{¶61}** The third and fourth assignments of error lack merit.

**{¶62}** The judgment of the Lake County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J.,

THOMAS R. WRIGHT, J.,

concur.