NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0304n.06

Nos. 16-6786/6807

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jun 18, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| GARY RISNER (16-6786); LARRY | ) | THE EASTERN DISTRICT OF |
| SHEPHERD (16-6807), | ) | KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:  CLAY, COOK, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**   Defendants-Appellants Gary Risner and Larry Shepherd appeal their convictions for conspiring to bribe voters during the 2014 election in Magoffin County, Kentucky.  Risner additionally appeals several of his substantive voter-bribery convictions. We **AFFIRM**.

## I.        Background

In 2014, Charles "Doc" Hardin, Defendant Gary Risner (Risner), and Renee Shepherd (Defendant Larry Shepherd's wife) were running for office on the Democratic ticket in Magoffin County, Kentucky.  The government gathered evidence that these individuals and others had formed an alliance that bought votes and otherwise fraudulently influenced elections in Magoffin County since at least 2002.

Risner, his ex-wife Tami Jo Risner, Mason Daniels, and Scott McCarty were indicted for conspiring to pay others to vote, in violation of  18 U.S.C. § 371, and offering to pay and paying others

to vote, in violation of 52 U.S.C. § 10307(c), in the 2014 primary and general elections in Magoffin County. A superseding indictment named Larry Shepherd (Shepherd) as a co-defendant. The government's theory was that Risner, Tami Jo Risner, Mason Daniels, and Scott McCarty approached voters and offered to pay them to vote for a particular slate of candidates; then Shepherd, whose position as Deputy Clerk placed him at the polling location, verified that the voter had voted for the slate, and Risner paid the voter.

A jury convicted Risner, Tami Jo Risner, and Shepherd on the conspiracy count, Tami Jo Risner on two counts of voter bribery,[1] and Risner on seven of eight counts of voter bribery. The jury acquitted Mason Daniels on all counts and acquitted Shepherd of the only substantive bribery count with which he was charged.

## A.     Testimony at Trial

## 1.     Scott McCarty

Co-conspirator McCarty pleaded guilty to misdemeanor fraud under 18 U.S.C. § 597 after agreeing to testify at his co-defendants' trial. The government filed two notices that it intended to introduce McCarty's testimony that Risner and Shepherd were parties to a continuing conspiracy to corrupt elections in 2002, 2006, 2008, 2010, and 2012. The district court overruled motions in limine to exclude McCarty's testimony, concluding it was admissible as background evidence and would "serve as a prelude to and complete the story of the charged crimes by explaining Risner's and Shepherd's knowledge of vote buying, their respective roles in the conspiracy, and the circumstances in which the conspiracy allegedly took root." [Order on Motions in Limine, R. 145 at PID 564–65].

At the beginning of McCarty's testimony, the district court instructed the jury:

> [A]t this time I will give a cautionary instruction to the jury that the information subject to this witness's testimony prior to the election in question and the time

---

[1] This court affirmed her conviction by Rule 34 Order. Case No. 16-6751 (June 9, 2017).

> period charged in the indictment, which is 2013 through 2014, is being provided to you as historical information.
>
> This information standing alone may, of course, not be used as substantive evidence in the case against any defendant. It is provided to you as historical information, background information, only.

[Trial Tr., R. 190 at PID 810].

McCarty testified that a group of individuals—including Risner and Shepherd—conspired together to corrupt elections for over a decade. McCarty explained that his role in the conspiracy began in 2002, when Hardin directed McCarty to identify any of McCarty's neighbors willing to sell their vote, and to pay those neighbors fifty dollars each in exchange for their unmarked, signed ballots. Hardin gave McCarty ten one-hundred-dollar bills and directed McCarty to mark the ballots (voting for Hardin) and cast them, which McCarty did. McCarty then paid each voter fifty dollars.

In 2006, McCarty was appointed[2] to the election board of a Magoffin County precinct where Hardin had fared poorly in previous elections. McCarty's official role was to work a certain voting machine. The night before the election, McCarty and Risner met at Hardin's home. During that meeting, McCarty was instructed to vote for a "ticket or a slate" of candidates that included Hardin, Renee Shepherd, and Risner. As planned, Risner sent voters seeking to sell their vote to McCarty's voting machine on election day. The voters would tell McCarty that Risner sent them, and McCarty would physically cast each voter's vote for the slate.

There was no county election in 2008, but McCarty testified to his role in a state-representative race. McCarty, Shepherd, Renee Shepherd, Hardin, and Randy Salyer met and "picked the [precinct] board" for McCarty's precinct to help ensure John Sizemore's election as state representative. Risner also asked McCarty to "vote extra votes during the course of the day at the election polls." [*Id.* at PID

---

[2] McCarty stated: "In 2006 election year was coming up for county races, and I got ahold of Jerry Helton and Dr. Charles Hardin and convinced them that I would like to sit on the election board in Carty Branch, and they got that done so I was part of that precinct that year." [*Id.* at PID 811]. There was no further explanation.

817–18]. After McCarty told Risner he cast sixty extra votes, Risner reviewed the voter roster and signed the names of sixty persons who had not voted.

In 2010, McCarty attended a meeting with Risner, Randy Salyer, and Shepherd. During that meeting, Randy Salyer opened a gun safe containing approximately fifty-to sixty-thousand dollars from which voters were paid. Randy Salyer told McCarty that Hardin had contributed $30,000, Larry and Renee Shepherd had contributed $10,000, and Gary Risner "said he put a couple thousand in." During early, in-person, absentee voting, Hardin's brother, a member of the fire department, parked a firetruck horizontally in front of McCarty's precinct. Shepherd, Risner, and McCarty placed two voting machines behind the firetruck so passers-by could not see the machines. If Risner had arranged to buy a person's vote, he would give the voter a blue ticket. The voter would give the blue ticket to McCarty, who in turn instructed the voter on the slate of candidates to select; McCarty handed the voter a red ticket after he or she voted; the voter then returned the red ticket to Risner, and Risner paid the voter fifty dollars.

In 2012, McCarty was the Democratic election judge[3] in his precinct. He testified that the same group of persons engaged in the same forms of voter bribery during that election. Once again, voters would arrive, ask McCarty to physically vote for them, and after doing so McCarty would send them to Risner for payment. McCarty explained that the group did not use the previously employed ticket system in 2012 "[b]ecause after [] 2010 there was discussion throughout the county that [they] might be able to trace that down and show evidence of vote buying." [*Id.* at PID 835].

McCarty testified that he "wanted to get away from" the conspiracy during the 2014 election for "personal reasons" and "wanted to do whatever [he] could to beat [Hardin]." [*Id.* at PID 835].

---

[3] In Kentucky, each county's board of elections includes two judges (one Democrat and one Republican), one clerk, and one sheriff of election. Ky. Rev. Stat. § 117.045. Election judges set up voting booths and provide voter assistance. *Id.*; Ky. Rev. Stat. § 117.255.

McCarty continued to work with Shepherd and Risner but secretly had some voters cast their votes for Hardin's challenger. McCarty worked in the 2014 primary election but not in the general election "because [he] had already fell out" with Risner and Hardin. McCarty used voter-assistance forms for individuals willing to sell their votes. McCarty testified that during the 2014 primary election he assisted several of the voters mentioned in the substantive voter-bribery counts.

McCarty also testified about a conversation in Shepherd's office sometime between September and November 2013 concerning the use of cell phones to facilitate the conspiracy:

> [M]e and Gary [Risner] were sitting there and Larry Shepherd, and we were discussing the upcoming election. And in the back of my mind I knew I wouldn't want to be sitting on the board, but I did hear them have a conversation about not using the tickets because they didn't want that to be an issue. So they discussed about using mobile phones during the upcoming election, cellular phones, throw-away phones.
>
> As far as me seeing them purchasing them, I don't know, but they definitely had conversations about that.

[*Id.* at PID 841]. During the primary election, Risner told McCarty that he verified whether a person had voted by calling Shepherd on a cell phone, but McCarty had no other knowledge whether Risner or Shepherd bought or used "throw-away" cell phones during the 2014 election.

> After McCarty testified, the district court gave another limiting instruction:
>
> [L]et me again remind you that I earlier instructed you that you would hear certain background evidence, and I gave you a limiting instruction as to how you can consider that evidence. . . .
>
> Again, you're instructed that you may consider that evidence but only as background evidence and not as substantive evidence on the charges that are before you to be decided.

[R.191 at PID 936].

### 2.     FBI Testimony

Tressa Whittington worked as a forensic accountant for the FBI. She analyzed the results of the 2014 Magoffin County general election, in particular the disparity between absentee-ballot votes[4] and election-day votes. Hardin received sixty-nine percent (69%) of the absentee-ballot vote compared to forty-six percent (46%) of the election-day vote. Renee Shepherd received seventy-eight percent (78%) of the absentee vote compared to fifty-one percent (51%) of the election-day vote. Risner received seventy-six percent (76%) of the absentee vote compared to slightly less than fifty percent (50%) of the election-day vote. Whittington testified that the races for the offices on the "slate" Risner instructed voters to choose (Charles Hardin, Renee Shepherd, and Gary Risner) "turned on the absentee votes"; in contrast, for other races on the ballot, the election-day and absentee percentages were "roughly the same . . . only off by a fraction of a percentage." [Trial Tr., R. 191 at PID 1187–90].

To corroborate McCarty's testimony that the historical acts described actually occurred, the government sought to introduce testimony regarding Randy Salyer's 2011 conviction of election fraud concerning the 2010 election. Outside the presence of the jury, the district court heard argument on the admissibility of Salyer's conviction. Because Salyer was not a defendant, his conviction could not be established under Fed. R. Evid. 803(22). Therefore, the government planned to call an FBI agent who was present throughout Salyer's trial and sentencing. Counsel for both Risner and Shepherd objected. The district court overruled the objections.

FBI agents Kenneth Kirk and Randy Copley testified about Salyer's 2011 conviction. Kirk testified regarding the overall 2014 investigation, that Randy Salyer had been convicted of election fraud concerning the 2010 election, and that Salyer's wife worked for Hardin. Copley testified that Salyer was convicted of vote buying, specifically, buying absentee ballots from registered voters.

---

[4] In-person absentee ballots and mail-in absentee ballots were combined to reach the total number of "absentee-ballot votes."

### 3. Voter Testimony

The government presented testimony from thirteen Magoffin County voters who had sold their votes to one or more Defendants in 2014.[5]

Angel Foltz testified that McCarty and another man paid her boyfriend, Mitchell Shepherd (no apparent relation to Defendant Larry Shepherd), for her vote. Mitchell Shepherd instructed Foltz to tell poll workers she would be out of town on election day in order to vote in-house absentee. Although she did not remember for whom she voted, Mitchell Shepherd instructed her to vote for certain candidates and she did so. She also testified that during the general election, there was a "man that helped me vote," specifically that a man "pushed the buttons that need[ed] to [be] pushed" on the voting machine. [Trial Tr., R. 191 at PID 1020–21]. Foltz received fifty dollars for her vote in each election, delivered by Mitchell Shepherd.

Mitchell Shepherd testified that Risner gave him fifty dollars to vote in the 2014 primary election and fifty dollars to vote in the 2014 general election after Risner told him which candidates to select, and that McCarty physically voted for him in the primary election because he did not know how to work the voting machine. Shepherd physically voted for him in the general election after Mitchell Shepherd told Shepherd which buttons to push. Risner also gave him fifty dollars for each election to give to Foltz, for a total of one-hundred dollars per election.

Roy Risner (no apparent relation to Gary Risner) testified that he gave Risner his signed, unmarked ballot in exchange for fifty dollars. Risner did not give Roy Risner the money directly; Roy found it in his car and understood it to be from Risner.

---

[5] Several of these witnesses testified to interacting only with co-defendants Tami Jo Risner or Mason Daniels.

Donnie Montgomery worked for Risner. After voting, Risner paid him fifty dollars.

James Donald Gambill went to Risner's home and offered to sell his vote. Risner offered one-hundred dollars for his vote and provided Gambill with a sample ballot that marked Hardin and Risner. Risner instructed Gambill to take the sample ballot to the courthouse during early voting, request voter assistance, and vote as instructed. Gambill went to the courthouse where Shepherd was checking in voters. Gambill told Shepherd he would not be able to vote on Election Day. Renee Shepherd then gave Gambill's absentee voter application to Shepherd, who completed it for Gambill. Gambill then voted with the assistance of another election worker. After voting, Gambill returned to Risner's farm, where Risner paid him one-hundred dollars.

Jamie Gibson lost his right to vote due to a felony conviction. Risner was apparently unaware of this and offered to buy Gibson's vote. Gibson recorded the encounter on his iPhone, and the video was played for the jury. Gibson offered to "get more votes for him," but Risner stated he would need to "see them in person." [*Id.* at PID 1165–66].

Hailee Hunley[6] testified that Tami Jo Risner offered to buy her vote. The government asked Hunley if Tami Jo said "anything about anybody observing" her vote, to which she responded: "[S]he let me know I was going to have someone come in and let me – make sure that I voted the right way." [Trial Tr., R. 236 at PID 1847–48]. Hunley previously identified Shepherd as the person who assisted her, and she identified him again at trial. Hunley testified that Shepherd "went back through" her ballot and submitted it for her. Hunley's husband Chad Hunley received money for her vote. Hunley believed the money was delivered by Tami Jo Risner but was not certain.

---

[6] Hunley was subpoenaed but failed to appear before the government rested its case-in-chief. The government therefore consented to acquittal on Count 2, which charged Shepherd and Tami Jo Risner with paying and offering to pay Hailee Hunley for her vote. She was later apprehended and testified, but the government did not move to reinstate Count 2.

### 4.    Defendants' Witnesses

Jerry Helton testified that he served as a precinct officer in Magoffin County. He also served as the Democratic challenger during early voting. On direct examination, Helton testified that he never bought or switched votes, that Risner never gave him "cash for votes," and that he did not see anyone do anything illegal in the 2014 general election. On cross-examination, the government initiated the following exchange:

> Q:  Now, you – would you consider it a fair statement that Magoffin County historically [has] had a lot of problems with vote buying and vote fraud?
>
> A:  Yes.
>
> Q:  You know about the lawsuits overturning elections?
>
> A:  Yes.
>
> Q:  In fact, 2014 was overturned by a lawsuit, wasn't it?
>
> A:  Yes.[7]

[Trial Tr., R.231 at PID 1567]. There were no objections to this questioning.

Shepherd presented the testimony of Manuel Montgomery, the Republican party chair for Magoffin County. [Trial Tr., R. 236 at PID 1707]. Montgomery appointed Justin Williams as the Republican county election commissioner during the 2014 general election. The previous commissioner "abruptly resigned" on Friday, October 17, 2014. As a result, although the Board "fast tracked" the appointment process, Williams did not assume responsibilities as an election

---

[7] Sometime prior to Defendants' trial, Hardin's opponent filed a civil suit in Kentucky state court to contest the results of the 2014 election. The trial court set aside the results of the election and declared the office vacant after finding "corrupt practices" and numerous statutory violations, including voter bribery and improper absentee-voting procedures. *Montgomery v. Magoffin Cty. Bd. of Elections,* 2015 WL 4876464 (Ky. Cir. Ct. Feb 20, 2015). That decision was affirmed by the Kentucky Court of Appeals. *Hardin v. Montgomery*, 2015 WL 3643448 (Ky. Ct. App. June 12, 2015). However, two weeks after Defendants' trial, the Kentucky Supreme Court reversed and remanded the case, concluding that although "[a] broad spectrum of election irregularities in this case aroused reasonable suspicions that warranted an investigation to determine the facts[,] . . . the accumulated evidence failed to establish improprieties sufficient to impact the overall validity of the results." *Hardin v. Montgomery*, 495 S.W.3d 686, 711 (Ky. 2016).

commissioner until Friday, October 24, 2014, four days after early voting began on Monday, October 20, 2014.

Republican candidates chose Garlena Workman to serve as the Republican challenger during early voting. She was present for the entirety of early voting. The district court examined Montgomery about Workman's position:

> THE COURT: . . . [Y]ou indicated that [Workman] was present during the entire absentee voting process for the 2014 election, the absentee process. And she was a member of the County Board of Elections, at the time; correct?
>
> A: She was picked to be a challenger.
>
> Q: Right. On behalf of the County Board of Elections or designee?
>
> A: Right.
>
> Q: You said she was there the entire time performing that duty?
>
> A: Yes, sir.

[Trial Tr., R. 236 at PID 1727].

Garlena Workman testified that Shepherd's role, as she understood it, was to start the voting machine. Workman also testified that she saw Shepherd assist "a number of voters" while she was stationed as a challenger. She remembered one specific voter that requested assistance from Shepherd by name. On cross-examination, Workman testified that she was not aware of any rules that prohibited Shepherd from assisting voters.

Justin Williams testified that Shepherd would take voters into the room, "bring up the ballot for the individual" and "give the instructions to the individual." [Trial Tr., R. 236 at PID 1774–75]. Williams did not see Shepherd use a cell phone. Williams remembered four voters who specifically asked for Shepherd to assist them in voting. When a voter requested Shepherd by name, Williams would either assist the voter alongside Shepherd or allow Shepherd to assist the voter alone while

Williams watched Shepherd closely. On cross-examination, Williams testified that he was not aware of any "provision in the law" prohibiting Shepherd from assisting voters or from being in the voting room.

## B.     Kentucky Election Laws

Defendants were not charged with violating any Kentucky statutes. However, the government cross-examined four defense witnesses (Helton, Montgomery, Workman, and Williams) about their understanding of election provisions after each witness testified that he or she did not see any improper conduct, and after Workman and Williams testified that they believed Shepherd was allowed to assist voters.

On direct examination, Shepherd's counsel asked Justin Williams about the training he received regarding which election personnel could assist a voter. The government objected, arguing "the law should come from the Court and not from the witness's understanding of what he was told by another witness outside the courtroom," and asked the court to instruct the jury accordingly. [Trial Tr., R. 236 at PID 1784]. Shepherd's counsel objected to the instruction. The district court sustained the government's objection and told the jury:

> Ladies and gentlemen, so there's no misunderstanding or confusion as to what's required under Kentucky law, I will advise you the Kentucky Law provides in part with respect to absentee voting that if the members of the county board of elections or their designees do not – do not serve as precinct election officers for absentee voting, the county clerk or the deputy county clerk shall supervise absentee voting.
>
> And in this particular case, members of the county board of elections, or the designees, were serving as precinct officers. And, therefore, the county clerk or the deputy county clerk could not supervise the absentee voting.[8]

[Trial Tr., R. 236 at PID 1784–87].

---

[8] As will be explained, *infra*, the second paragraph is incorrect.

During the jury-instruction conference, the government offered a draft of a jury instruction on the relevant Kentucky law. Shepherd's counsel again objected.

The district court also drew counsel's attention to 31 Ky. Admin. Regs. 4:040 § 2(2), which provides: "A voter may request assistance by a person of his own choice who is not an election officer. Except in no case may the county clerk or his staff provide such assistance." Counsel replied that neither his client nor the witnesses knew about the regulation. The district court responded:

> THE COURT: Well, wouldn't this be clearly relevant though to the argument that you made through your witnesses that nothing improper happened, that there were no problems, no violations whatsoever. And you put on witnesses to say we didn't see anything wrong.
>
> And Mr. Taylor points out, well, you know, Mr. Shepherd was not allowed to do what he did in assisting these voters . . . .
>
> The question is whether it would be appropriate to instruct the jury on what Kentucky law provides with respect to who can assist and who can't assist. . . . .
>
> You tried to get this in through these witnesses that they could do certain things under Kentucky law, and the government has pointed out that that's not what statutes and the administrative regulations provide.

[Trial Tr., R. 236 at PID 1833–35]. The court's instruction (Instruction No. 21) read as follows:

> (1) You are instructed that Kentucky law governing in-house absentee voting provides that, when both political parties provide election officers for early in-house voting, those officers shall perform the duties and have the same authority as Election Day precinct office[r]s. In that case, neither the county clerk nor his or her staff may supervise the absentee voting.
>
> (2) Kentucky law further provides that when a voter requests assistance in voting from the election officers, both party judges should be present with the voter at the voting machine and one judge should assist the voter in the presence of the other. A voter may request assistance by a person of his own choice who is not an election officer, except in no case may the county clerk or his or her staff provide such assistance.
>
> (3) Next, other than exceptions not relevant here, Kentucky law provides that no person other than election officers, challengers, or persons authorized by law to assist voters, shall be permitted within the voting room while the vote is being polled.

[Jury Instructions, R. 175 at PID 685].

## II.    Evidentiary Issues

## A.    Background Evidence

Both Risner and Shepherd argue that the district court erred in admitting evidence relating to Magoffin County elections in 2002, 2006, 2008, 2010, and 2012. We review evidentiary issues for abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). A district court abuses its discretion when it erroneously permits the admission of evidence, and that admission affects a substantial right of a party. *Id.* Under this standard, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a).

The district court admitted McCarty's testimony regarding previous elections as background evidence. The district court also analyzed the testimony under 404(b), finding it admissible. However, it is clear from the trial transcript that the testimony was admitted only as background evidence.[9]

"Background or *res gestae* evidence is an exception to Rule 404(b) [that] consists of those other acts that are inextricably intertwined with the charged offense." *United States v. Adams*, 722 F.3d 788, 810 (6th Cir. 2013) (citations and quotation marks omitted); *see also United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). "Concerned with the potential for abuse of background evidence as a means to circumvent Rule 404(b), we have recognized severe limitations as to temporal proximity, causal relationship, or spatial connections among the other acts and the charged offense." *Adams*, 722 F.3d at 810 (citations and quotation marks omitted).

---

[9] *See* [Trial Tr., R. 191 at PID 1051–52] ("THE COURT: Well, just so we're – just so we're clear on this. I have not admitted any evidence under 404(b). . . . I've only admitted . . . background evidence"); *see also* [Trial Tr., R. 236 at PID 1817–19] ("THE COURT: In the memorandum opinion that was filed early in the case on the motion in limine, I indicated that this would be proper background evidence and that the United States may also seek to introduce the evidence. . . . But the government in the course of the trial never asked me to give an instruction that this would also be considered other bad act evidence under 404(b) for purposes of proving intent. So if you want me to give . . . the 404(b) instruction, I will expand this and tell the jury that they may also consider this as other bad acts with regard to intent of the defendants."). MR. CURTIS: No, I don't want to go there.").

Risner argues McCarty's testimony regarding the 2002 and 2006 elections lacked "any temporal proximity, causal relationship, or special connection," and that testimony regarding the 2008 and 2012 elections involved factually distinguishable conduct and was thus irrelevant. [Appellant Risner Br. at 18–19]. The district court rejected similar arguments at trial:

> Here, the evidence . . . occurred close in time with the underlying criminal conduct charged in the Superseding Indictment. This is especially true in political elections, which typically are not held every year. Thus the government is able to establish a close temporal connect between the evidence and the charged offense. It appears the government has also established a causal connection between the evidence and the charged conduct. McCarty's testimony provides background regarding the circumstances from which the charged conduct developed, including a history of the alleged conspirators' relations.

[Order, R. 114 at PID 363].

In *Adams*, the defendants were charged with conspiring to buy votes in the 2002, 2004, and 2006 elections. The government sought to introduce evidence that several co-conspirator defendants (1) bought votes in 1993; (2) operated as a vote buyer "in the late 70's–90's"; and (3) approached witnesses to buy votes "in the 1980's." *Adams*, 722 F.3d at 811. On appeal, the defendants argued the testimony lacked temporal and causal proximity to the conspiracy under *Clay*, "given that most of the events . . . occurred in the 1980's." *Id.* This court disagreed: "[V]ote buying . . . by nature cannot be committed every day because elections . . . are not everyday occurrences. Therefore, in the context of this case, evidence of vote buying from the 1980s was not as remote as in other cases . . . ." *Id.* The defendants also argued the causal connection was too attenuated to be admissible and this court again disagreed: "[T]his evidence is a prelude to and 'completes the story' of the charged conspiracy" by showing how the defendants rose to political power, "their knowledge of vote buying, and their personal relationship." *Id.* at 812.

In this case, temporal and causal proximity are even stronger than in *Adams*. McCarty's testimony regarding elections from 2002–2012 provided background for the offenses alleged to have

occurred in 2013 and 2014. As the district court outlined, the evidence showed "Risner's and Shepherd's knowledge of vote buying, their respective roles in the conspiracy, and the circumstances in which the conspiracy allegedly took root." [Order, R. 145 at PID 565]. Under *Adams*, the evidence was admissible.

Risner argues that *Adams* "cannot be used for authority" here because in *Adams* "the scope of the . . . evidence was very narrow and the same two defendants were involved both in the then current election and prior elections." [Appellant Risner Br. at 18]. The district court adequately addressed this argument: "Although the individuals involved in the 2010 and 2014 events are not identical, the cast of characters is largely the same. The evidence completes the story of the charged conduct and, therefore, is likely to enhance juror's understanding of the events." [Order, R. 114 at PID 363]. Further, Risner's understanding of the evidence in *Adams* is inaccurate: the challenged historical evidence implicated five of eight defendants. *Adams*, 722 F.3d at 811.

Shepherd challenges the background evidence under Fed. R. Evid. 403, asserting that the evidence was improperly admitted because "[t]he slight evidence against Shepherd made the prior evidence more important to the prosecution to achieve a conviction; but the lack of evidence related to the actual crimes for which Shepherd was charged also made the prior bad acts evidence that much more prejudicial." [Appellant Shepherd's Br. at 12–13]. FRE 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "The district court is afforded broad discretion in making this determination; therefore, [this court] review[s] for abuse of discretion and must maximize the probative value of the challenged evidence and minimize its potential for unfair prejudice." *Adams,* 722 F.3d at 812 (quotation marks and citation omitted).

The district court conceded that McCarty's testimony "will likely prejudice the defendants," but found "there is no indication they will be prejudiced unfairly." [Order, R. 145 at PID 567] (citing *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)). The district court found that McCarty's testimony was probative because it explained "Risner's and Shepherd's knowledge of vote buying, their respective roles in the conspiracy, and the circumstances in which the conspiracy allegedly took root." [*Id.* at PID 565]. Regarding prejudice, as in *Adams*, "the picture painted by the government was not pretty, but it was not unfairly ugly either." *Adams*, 722 F.3d at 812.

Shepherd relies on two cases for support. In *United States v. Cook*, 538 F.2d 1000 (3rd Cir. 1976), the Third Circuit held the district court abused its discretion when it allowed the prosecution in an armed bank robbery trial to introduce evidence of the defendant's prior sodomy conviction to show his gun possession was improper. The court noted that, "[w]here, as here, evidence of other crimes is relevant to a collateral issue only, the trial court must consider the government's actual need for that evidence." *Id.* at 1004. However, McCarty's testimony was not collateral to the crimes charged. The "inflammatory evidence" of sodomy in *Cook* had no relevance to armed bank robbery, particularly because Cook had other felony convictions, but the government chose to introduce that conviction because of its inflammatory nature. *Cook* is inapposite.

Shepherd's other authority, *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997), is similarly distinguishable. There, nine government witnesses testified about extraneous loans during the defendant's trial for bank fraud. *Id.* at 432–35. Thus, the government's "extensive and undiscriminating use" of the 404(b) evidence "was offered in such a large and unchecked way that its permissible limited use was overwhelmed." *Id.* at 434. Here, the court gave limiting instructions, and the testimony was confined to relevant background.

Additionally, we have consistently found that limiting jury instructions can help mitigate the chance of substantial prejudice. *See, e.g.*, *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). The district court gave three separate limiting instructions—prior to McCarty's testimony, at the conclusion of his testimony, and in Jury Instruction No. 29. Each instruction explained that the evidence was "offered to complete the story of the charged offense or offenses," but clearly admonished the jury that the testimony was "not substantive evidence regarding the counts charged in the indictment. Therefore, you must not consider it for any other purpose." [Jury Instructions, R. 175 at PID 694].

The district court did not abuse its discretion in allowing McCarty's testimony.

### B. Salyer Conviction

Both Risner and Shepherd contend that evidence of Randy Salyer's conviction should have been excluded under Rule 403. Risner relies on *Adams*, where the government "introduced testimony that the defendants may have been involved with drug dealers on the theory that this might have been a source of money to buy votes." [Appellant Risner's Br. at 23–24].

Risner's reliance on *Adams* is not persuasive. In *Adams*, we found that evidence of drug dealing "does not qualify as background evidence because it is not inextricably intertwined with the charged offense [of vote buying]. The evidence does not serve as 'a prelude to the charged offense' or 'complete the story' because there was no allegation that drug money . . . was used to buy votes in the charged conspiracy." *Adams,* 722 F.3d at 816 (quoting *Hardy*, 228 F.3d at 748). Here, McCarty testified that Salyer was part of the vote buying conspiracy in 2008 and 2010. The government introduced Salyer's conviction "to corroborate Scottie McCarty, to give the jury additional [bases] for finding" the acts he described actually occurred. [Trial Tr., R. 191 at PID 1049].

Salyer's conviction for vote buying corroborated McCarty's testimony about the conspiracy's actions during the 2010 election. Defendants appropriately attacked McCarty's credibility using bias, prejudice, and motive. The district court did not abuse its discretion in concluding that the probative value of Salyer's conviction as corroborative of McCarty's testimony was not substantially outweighed by the risk of undue prejudice. Further, the district court's limiting instruction on all background evidence ameliorated the potential for undue prejudice. Therefore, testimony about the conviction was not an abuse of discretion.

### C. Cross-Examination about 2014 Election Contest

Shepherd and Risner both argue that the government should not have referred to the 2014 election litigation in cross-examining Jerry Helton. Because neither Shepherd nor Risner objected to the questioning at trial, we review for plain error. *United States v. Olano*, 507 U.S. 725, 731 (1993). Under the plain-error standard, this court may remedy an error only if it is "clear or . . . obvious[]" and "affect[s] substantial rights." *Id* (quotation marks omitted).

Risner and Shepherd argue that the government knew that the Kentucky case was not final because it was still pending on appeal: "The point being driven home to the jury was, of course, that a court had already declared the election to be a fraud, thereby further tainting the proceedings" against Defendants. [Appellant Shepherd Br. at 15].

The government contends the cross-examination question was "plainly probative of Helton's potential bias or flawed perception or both." [Appellee's Br. at 36]. Although "Helton claimed that he observed no illegalities[,] . . . a Kentucky circuit court had vacated the results of the election based on a finding of fraud and was affirmed by the Kentucky Court of Appeals." [*Id.*].

The potential prejudicial effect of the jury hearing that a court had overturned the election for fraud is apparent. However, we review for plain error, and any error of the district court in failing to

intervene *sua sponte* was not clear, and likely did not "affect[] the outcome" of the trial. *See United States v. Zidell*, 323 F.3d 412, 425 (6th Cir. 2003) ("In addition, our authority to correct a plain error is discretionary, and should be employed only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'") (quoting *Olano*, 507 U.S. at 736). The question was raised as a vehicle to challenge Helton's perception of whether the 2014 election was properly run, and it did not deprive Defendants of their right to a fair trial when viewed in light of the other evidence presented.

## III.     Sufficiency of the Evidence

Risner argues the district court erred in denying his motion for acquittal on Counts 1 (conspiracy), 11 (buying Angel Foltz's vote in the general election), and 14 (buying Angel Foltz's vote in the primary election) because there was insufficient evidence to support these convictions. Shepherd asserts his conviction under Count 1 was based solely on the background historical evidence. We review these claims de novo. *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007) (citations omitted). "However, a sufficiency of the evidence challenge places a very heavy burden on the defendants-appellants: they must show that after viewing the evidence in the light most favorable to the prosecution, [no] reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016) (citations and internal quotation marks omitted). We may "not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted).

### A.     Count 1: Conspiracy

A violation of 18 U.S.C. § 371 requires proof that: (1) two or more individuals agreed to violate the laws of the United States; (2) the defendant knowingly and voluntarily joined the conspiracy; (3) one of the conspirators performed an overt act; and (4) the "overt act was knowingly done in furtherance

of some object or purpose of the conspiracy." *United States v. Damra*, 621 F.3d 474, 498 (6th Cir. 2010) (quoting *United States v. Beverly,* 369 F.3d 516, 532 (6th Cir. 2004)).

Both Shepherd and Risner contend their conspiracy convictions were based solely on historical evidence. We disagree. Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence regarding the 2014 election to support the conspiracy convictions.[10]

McCarty testified regarding the conversation in Shepherd's office concerning the reluctance to use the ticket method for fear of detection, and the possibility of using drop phones. He further testified about his interaction with Jamie Gibson:

Q: Do you recall an incident with Jamie Gibson?

A: Yes, I do. . . .

Q: Okay. Did you have conversations with him in 2014 about getting paid?

A: Yes, I did. . . . I received a text message from Jamie Gibson, and he had – it was a pretty long one. He said that if I didn't pay him the $50 or get Rooster [Risner] to pay it or he wanted paid [sic], that he was going to go to the FBI.

Q: Okay. What happened next?

A: I believed it. I didn't say nothing at that second, and a couple days went by and Gary [Risner] called me and wanted me to go up there and pay him.

Q: Did you?

A: No, I didn't. And during the conversation Gary [Risner] told me, he said, I need to go pay him, but he ain't voted yet.

And I said, well, that's weird, why hasn't he voted?

And he said, well, I just talked to Larry Shepherd on the phone, and he hasn't been up there and voted, but I'm going to have to go pay him.

[Trial Tr., R. 190 at PID 840–41].

---

[10] Regarding the conspiracy itself, as the district court observed, the FBI testimony regarding the election result for the offices on the slate provides strong evidence of a conspiracy to buy absentee votes.

Additionally, numerous voters testified that either Risner or Tami Jo Risner offered to buy and actually bought their votes in both the primary and general elections. Regarding Risner specifically, Mitchell Shepherd, Roy Risner, Donnie Montgomery, James Donald Gambill, and Jamie Gibson all testified that Risner personally offered to buy and did buy their votes. Jamie Gibson recorded the encounter, which was played before the jury. Other witnesses testified that they were observed in voting or their votes were reviewed. This evidence adequately establishes the conspiracy to buy votes in the 2014 election, overt acts in pursuit of the conspiracy, and Risner's knowing and voluntary participation in and advancement of the conspiracy. Further, as the district court observed, the FBI testimony regarding the discrepancy between the absentee and election-day vote provides circumstantial evidence of the conspiracy.

Admittedly, the evidence against Shepherd was less overwhelming; it was nevertheless sufficient. In addition to evidence provided by McCarty, several witnesses testified that Shepherd assisted them in voting, and there was testimony that some voters asked for Shepherd by name. Hailee Hunley testified that Tami Jo Risner told her that someone would review her ballot to ensure she voted correctly, and that Shepherd reviewed her ballot. Viewed in light of McCarty's testimony, this evidence is sufficient for a jury to find Shepherd knowingly and voluntarily entered into the conspiracy. *United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993).

Risner analogizes the evidence in this case to *United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999). In *Gibbs*, a "loose-knit group" of drug dealers "decided to band together to form a group that would offer protection to its members." *Id.* at 418. This court found that, despite the fact that the group "had no hierarchy and was not run like a business," "[t]he government [] presented enough evidence in this case for a jury to find that there was a tacit agreement among at least some of the individuals named in the original indictment." *Id.* at 420.

Risner relies on the *Gibbs* panel's determination that the evidence was insufficient to convict six of the defendants of the conspiracy charge where the government's evidence proved only that those six defendants "independently sold a lot of drugs. Some bought from each other. Others, though acting independently, associated with each other." *Id.* at 423. Risner contends that the "only thing the Government has for the 2014 Elections is that McCarty overheard a conversation between Risner and Shepherd in the Fall of 2013 about the use of cell phones." [Risner Rep. Br. at 3]. But Risner conflates the evidence of the existence of a conspiracy—which was sufficient in *Gibbs* and is sufficient here— with the sufficiency of the evidence of an individual defendant's involvement in the conspiracy, which was lacking for several defendants in *Gibbs*. Here there was substantial testimony regarding Risner's involvement. Risner's reliance on *Gibbs*, therefore, is misplaced.

### B.   Risner Counts 11 and 14: Substantive Voter Fraud re: Angel Foltz

Risner also challenges his convictions on Counts 11 and 14, which charged him with paying and offering to pay Angel Foltz for her votes in the 2014 primary and general elections. He argues that because Foltz never identified him during her testimony, there was insufficient evidence that he paid for her votes. Risner notes that the district court denied his motion for a directed verdict on those counts "because the trial judge thought she mentioned Gary Risner's name under her breath. However, a review of the trial transcript does not reveal this." [Appellant Risner Br. at 14]. Risner appears to be correct; Foltz's transcribed testimony does not mention Risner. However, Foltz's testimony established that she was offered and was paid money to vote for the slate of candidates in the 2014 primary and general elections. The only issue is whether the government presented sufficient evidence to find that Risner bought her votes. *See Robinson*, 813 F.3d at 255. It did.

Mitchell Shepherd testified:

Q:  Did Mr. Risner give you money to give to Ms. Foltz?

A: Yes.

Q: Did he give you money to give to Ms. Foltz both times we've talked about [primary and general elections]?

A: I'm pretty sure.

Q: How much money did he give you to give to Ms. Foltz?

A: 50.

Q: 50 each time?

A: Yep.

[Trial Tr., R. 191 at PID 1037–38]. Foltz answered "yes" when asked if she chose "the candidates that [she] voted for because [she] knew that [she] would receive money voting for those candidates." [*Id.* at PID 1025]. She also testified to receiving fifty dollars each election through Mitchell Shepherd after being instructed which candidates to select. A rational trier of fact could conclude beyond a reasonable doubt that Risner paid for Foltz's vote in both elections. *See United States v. Sease*, 659 F.3d 519, 523 (6th Cir. 2011).

### IV.    Jury Instruction No. 21

Both Risner and Shepherd argue the district court committed reversible error in instructing the jury on Kentucky law related to in-person absentee voting. We review a district court's jury instructions for an abuse of discretion. *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010). "When jury instructions are claimed to be erroneous, we review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *Id.* (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)).

Jury Instruction No. 21 encompassed several statutory provisions most pertinent to Shepherd and instructed, in essence, that Shepherd should not have been in the voting room for any reason and

that he should not have assisted voters. This supported the government's theory that Shepherd's role in the conspiracy was to verify paid voters. The instruction was given at the government's request because Shepherd elicited testimony from defense witnesses Jerry Helton, Garlena Workman, and Justin Williams that Shepherd, as Deputy Clerk, was allowed to be in the voting room and to assist voters.

Ky. Rev. Stat. § 117.085 sets forth in-person absentee-voting requirements. In pertinent part, the statute provides:

> [M]embers of the county board of elections or their designees who provide equal representation of both political parties may serve as precinct election officers, without compensation, for all in-person absentee voting performed on a voting machine in the county clerk's office or other place designated by the county board of elections and approved by the State Board of Elections. If the members of the county board of elections or their designees serve as precinct election officers for the in-person absentee voting, they shall perform the same duties and exercise the same authority as precinct election officers who serve on the day of an election. If the members of the county board of elections or their designees do not serve as precinct election officers for in-person absentee voting, the county clerk or deputy county clerks shall supervise the in-person absentee voting.

Ky. Rev. Stat. § 117.085(1)(h). The portion of Jury Instruction No. 21 relevant to this statute read:

> You are instructed that Kentucky law governing in-house absentee voting provides that, when both political parties provide election officers for early in-house voting, those officers shall perform the duties and have the same authority as Election Day precinct office[r]s. In that case, neither the county clerk nor his or her staff may supervise the absentee voting.

[Jury Instructions, R. 175 at PID 685]. Shepherd correctly contends the instruction was misleading because "there was not an instruction that stated if the Magoffin County Board ("Board") of Elections did not provide equal representation . . . then the deputy county clerk is legally required to supervise the election." [Appellant Shepherd's Br. at 7]. Shepherd maintains this is critical because the board did not provide a Republican designee for four days of absentee voting, and therefore the instruction "misled the jury to believe Shepherd violated the law when he was actually carrying it out." [*Id.* at 8].

> It appears that the district court determined there was in fact equal representation:
>
> THE COURT: I read the statute. . . If members of the County Board of Elections, or its designee, do not serve as precinct election officers for absentee voting, the county clerk or deputy shall supervise the absentee voting.
>
> Members of the county board of elections, or the designees, were serving [as] precinct officers, so the county clerk or the deputy county clerk could not supervise the absentee voting.
>
> And Mr. Shepherd is not allowed to assist voters.
>
> I will give that instruction if requested by the United States at the end of the case. They've established that during the testimony of the witnesses.
>
> MR. NEMES: Your Honor, the [first] four days [the] Republican was not sitting.
>
> THE COURT: There may have been a person absent, but the board of elections was there and supervised.

[Trial Tr., R. 236 at PID 1741]. The district court seems to have based this finding primarily on Manuel Montgomery's answer that Garlena Workman was picked "[o]n behalf of the County Board of Elections or designee." [*Id.* at PID 1727].

However, Montgomery made clear that Workman was chosen as a challenger. Other portions of the Kentucky statute explicitly distinguish between election officers and challengers. *See, e.g.*, Ky. Rev. Stat. § 117.235(1). Further, Ky. Rev. Stat. § 117.315(2), which outlines the appointment and role of challengers, notes that "[t]he challenger shall be a registered voter of the county in which the primary or election is held, shall be appointed in writing by the chair of the committee, independent candidate, or candidates representing a ticket, and shall produce written appointment on demand of any election officer." Ky. Rev. Stat. § 117.315(2). Challengers are chosen by a different process and must produce credentials at the request of an election officer. A challenger is not an election officer.

Thus, Workman's presence as a challenger was not as an election officer and there was no equal representation of the political parties until Williams arrived on Friday, October 24. It was therefore

misleading to omit the subsection's final provision: "If the members of the county board of elections or their designees do not serve as precinct election officers for in-person absentee voting, the county clerk or deputy county clerks shall supervise the in-person absentee voting." Ky. Rev. Stat. § 117.085(1)(h). Instead of understanding that Shepherd was required to supervise voting, the jury was instructed that he was forbidden from doing so.

A district court has "broad discretion in drafting jury instructions and does not abuse its discretion unless the jury charge fails accurately to reflect the law." *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001) (citation omitted). Here, the instruction failed to accurately reflect the law regarding the first four days of early voting. However, "no single provision of the jury charge may be viewed in isolation, rather, the charge must be considered as a whole." *Id.* (citing *United States v. Lee*, 991 F.2d 343, 350 (6th Cir.1993)).

In Instruction No. 21, the court also instructed the jury that "[a] voter may request assistance by a person of his own choice who is not an election officer, except in no case may the county clerk or his or her staff provide such assistance." [Jury Instructions, R. 175 at PID 685]. Shepherd argues that because Ky. Rev. Stat. § 117.255(3) does not include the limitation on the county clerk and staff, the instruction was incorrect. However, 31 Ky. Admin. Regs. 4:040 § 2(2) provides: "The county clerk and his or her staff shall not provide any voter with assistance in voting." The district court brought this provision to Shepherd's counsel's attention and counsel conceded the regulation applied.[11] He argued only that Shepherd and the witnesses were unaware of the provision. Therefore, it was neither incorrect nor misleading to include the instruction. Separate and apart from whether Shepherd was

---

[11] During oral argument, Shepherd's counsel asserted that this provision only applied when there was equal representation. However, the regulation states: "(2) The county clerk and his or her staff shall not provide any voter with assistance in voting, pursuant to the provisions of KRS 117.255." 31 Ky. Admin. Regs. § 4:040. Ky. Rev. Stat. § 117.255 says nothing about equal representation; it outlines the procedures for assisting voters. The regulation regarding equal representation is found in Ky. Rev. Stat. § 117.085(h), which is not mentioned in 31 Ky. Admin. Regs. § 4:040.

required to "supervise the absentee voting," Shepherd was not permitted to assist voters under the regulation.

The final section of Instruction No. 21 was based on Ky. Rev. Stat. § 117.235(1), which provides: "No person, other than the election officers, challengers, person assisting voters . . . and a minor child in the company of a voter, shall be permitted within the voting room while the vote is being polled" with certain listed exceptions. Instruction No. 21 stated: "Next, other than exceptions not relevant here, Kentucky law provides that no person other than election officers, challengers, or persons authorized by law to assist voters, shall be permitted within the voting room while the vote is being polled." [Jury Instructions, R. 175 at PID 685]. At trial, Shepherd's primary argument was that he was not aware of the law.

On appeal, Shepherd contends the "other exceptions" included his authority "to keep order and enforce the law." [Appellant Shepherd's Br. at 10] (citing Ky. Rev. Stat. § 117.235(1)(b)). However, Garlena Workman and Justin Williams both testified that Shepherd was in the room to initialize voting machines and to assist voters, not to "keep order and enforce the law." Shepherd also argues he was authorized in the voting room because "judges of election" may enter to adjust the voting machine "if the machine is so constructed as to require adjustment after one person has voted before another person may vote." Ky. Rev. Stat. § 117.255(9). However, Shepherd was not a "judge of election." Although he entered the room to perform that role—to initialize the voting machine—he was not allowed to do so while voting was taking place. According to this statute, the "judge of election" should have done that. Therefore, the final provision of Instruction No. 21 was neither incorrect nor misleading.

Finally, Shepherd argues that the district court abused its discretion in including the instruction even if it was accurate, because neither Shepherd nor the other election officials were aware of any statutes or regulations outlined in the instruction. However, as the district court explained, Shepherd

elicited testimony from Jerry Helton, Garlena Workman, and Justin Williams that Shepherd was allowed to be in the voting room and to assist voters. The fact that the witnesses were unaware that their understanding was inaccurate under Kentucky law was relevant to the credibility of their testimony that the election was properly conducted. Ultimately, the relevant question was whether Shepherd was aware of the statutes and regulations providing that his presence in the voting room and his assisting voters were forbidden. However, under the circumstances, the district court did not abuse its discretion by including the instruction.

Once Williams arrived on the fifth day of early voting, equal representation was satisfied and Shepherd was no longer allowed, let alone required, to supervise the voting. Pursuant to Kentucky law, Shepherd was never allowed to assist voters, nor was he allowed to be in the voting room while a vote was being polled. The fact remains, however, that the instruction was misleading regarding Shepherd's obligation to "supervise voting" during the first four days of early voting.

Nevertheless, we "will reverse a judgment based upon an improper jury instruction 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Beaty*, 245 F.3d at 621 (citation omitted). Although Shepherd was required to "supervise absentee voting" for the first four days, Shepherd was not allowed to assist voters even during that period, and there was testimony from seven witnesses that Shepherd assisted a number of voters. Further, he continued to assist voters after there was equal representation. Although the first portion of Instruction No. 21 was misleading, we conclude that it was not prejudicial, viewing the jury instructions as a whole.

**V.      Prosecutorial Misconduct**

Shepherd argues the government prejudiced his right to a fair trial "by appealing to the jury's passions and prejudices in asking them to end vote-buying in Magoffin County" during its opening statement and closing argument.  [Appellant Shepherd's Br. at 16].

Prosecutorial-misconduct inquiries have two steps.  *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008) (citation omitted).  First, this court determines whether the remarks were improper. *Id.* Second, if the remarks were improper, this court analyzes whether they were so flagrant as to warrant reversal.  *Id.*  Four factors help in determining flagrancy: "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *Id.* (citation omitted).

While this court would typically review the argument de novo, we review for plain error here because neither Risner nor Shepherd objected to the government's remarks. *See id.*  "Plain-error review requires us to determine whether (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."  *Id.* at 376–77 (citation and internal quotation marks omitted).  In our analysis, we "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole."  *Id.* at 377.

Shepherd points to portions of the government's opening statement, closing argument, and rebuttal argument that he argues evince flagrant prosecutorial misconduct.  The government's opening statement noted that "this crime goes to the very foundation of our democratic system. It's that right for each of us to have our vote count the same as the next person and not be diluted by those who would buy votes that are meaningless to the person who has sold its vote."  [Trial Tr., R. 240 at PID 1994].

- 29 -

The government's closing argument included the following: "We . . . have the right to choose who leads our country, our states, our cities, our counties. . . . In Magoffin County that right was taken from the people . . . . They didn't get to pick their leaders. Their leaders were chosen for them." [Trial Tr., R. 241 at PID 2098–99].

During rebuttal, the government told the jury that election fraud "will happen again unless we do something about it." [Trial Tr., R. 241 at PID 2155]. The government continued:

> And I can tell you sometimes we look out in society, and we see people doing something that's wrong, it's illegal, it's immoral, in this case illegal, and we say, you know, somebody ought to do something about that.
>
> Well, you know what the next question always is? Who is somebody? Who's somebody that's going to do something about it? Well, today somebody is you. And if you don't do it, nobody else will. One shot. If you don't do it, it doesn't get done.

[*Id.*].

The government contends the opening statement remarks "were fair references to the charged conspiracy, the evidence of the conspiracy's purpose, and the conspiracy's logical effects." [Appellee's Br. at 48]. Further, it argues the rebuttal remarks were proper because they "did not mislead the jury or prejudice defendants, but pointed out the role of the jury in the instant case." [*Id.* at 50–51] (citing *United States v. Coffman*, 574 F. App'x 541 (6th Cir. 2014)).

Shepherd argues these statements "were more of a call to arms asking the jury to rise up and end vote buying than they were a sober call to convict Shepherd based on the evidence presented a trial." [Appellant Shepherd Br. at 19]. For support, Shepherd cites *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991). In that case, the defendant was tried for selling cocaine. During closing arguments, the prosecutor stated: "I'm asking you to tell [the defendant] and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and . . ." at which point the district court stopped the prosecutor because defense

counsel objected. *Id.* at 1148. Counsel moved for a mistrial, which the district court denied. This court reversed, finding:

> The fear surrounding the War on Drugs undoubtedly influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision finding defendant guilty or innocent of the crimes with which she was charged. The substance of the statements made by the prosecutor in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regarding the War on Drugs by urging them to send a message and strike a blow to the drug problem.

*Id.* at 1153.

Crucially, the defendant in *Solivan* objected, so this court reviewed de novo rather than for plain error. Under plain-error review, inappropriate comments alone do not justify reversal where the proceedings were otherwise fair. *United States v. Hitow*, 889 F.2d 1573, 1579 (6th Cir. 1989) ("Even if certain comments are found to be inappropriate, they . . . must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.") (citation omitted). "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (quoting *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994)).

Assuming arguendo that the remarks crossed the line, viewed in the context of the proceedings as a whole, the comments were not so far past what is acceptable that the district court was obliged to jump in *sua sponte* and admonish the prosecutor. Further, viewing the record as a whole, the statements were not likely to have misled the jury or caused them to decide the case based on passion or prejudice, rather than the evidence. *Henry*, 545 F.3d at 376; *see Coffman,* 574 F. App'x at 567; *United States v. Shalash,* 108 F. App'x 269, 280 (6th Cir. 2004). In sum, the district court's failure to interject *sua sponte* was not clear or obvious error, did not affect Shepherd's substantial rights, and did not "seriously

affect[] the fairness, integrity, or public reputation of the judicial proceedings." *Henry*, 545 F.3d at 376–77.

## VI. Cumulative Error

Both Risner and Shepherd argue that, even if none of the individual errors warrant a new trial, the cumulative effect is so prejudicial as to warrant reversal. The standard of review is whether the cumulative effect of errors "deprived [Defendants] of a trial consistent with constitutional guarantees of due process." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012) (citation omitted).

Here, the district court did not err in any of the evidentiary holdings challenged on appeal, and the district court did not plainly err in failing to intervene during the government's opening statement and closing argument. The only error we find is in the first section of Jury Instruction No. 21, which was misleading but does not warrant reversal. Because the single error did not render Defendants' trial fundamentally unfair, cumulative error analysis is not applicable.

## VII. Conclusion

For the foregoing reasons, we **AFFIRM** both convictions.